APPEAL NO. 25-2287

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, on behalf of itself and its members; and SCV PREGNANCY CENTER,

*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:24-cv-08468-HDV-MARx

## OPENING BRIEF OF APPELLANTS

John J. Bursch
Erin M. Hawley
Lincoln Davis Wilson
Caroline C. Lindsay
ALLIANCE DEFENDING FREEDOM
440 First Street NW
Suite 600
Washington, DC 20001
(202) 393-8690

J. Caleb Dalton
Erik C. Baptist
Allison H. Pope
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655

**CORPORATE DISCLOSURE STATEMENT**

Plaintiffs National Institute of Family and Life Advocates and

SCV Pregnancy Center issue no stock and have no parent corporation.

# TABLE OF CONTENTS

Corporate Disclosure Statement.................................................i

Table of Authorities..............................................................v

Statement of Jurisdiction......................................................1

Statement of the Issues........................................................2

Pertinent Statutes and Regulations .......................................4

Introduction.........................................................................5

Statement of the Case ..........................................................7

      A.    Progesterone therapy works by using supplemental progesterone to counteract the effects of the abortion drug mifepristone ..............................................8

      B.    Progesterone therapy has been used for almost 20 years to save an estimated 6,000 babies after their mothers took mifepristone and then chose reversal ...........10

      C.    The Attorney General censors progesterone therapy advocacy, continuing California's targeting of life-affirming pregnancy centers .................................14

      D.    The Centers' progesterone-therapy advocacy is chilled, and they move for a preliminary injunction.......................17

      E.    The district court denies the Centers' motion for a preliminary injunction .......................................20

Summary of Argument........................................................22

Standard of Review .............................................................24

Argument...........................................................................25

I.    The Centers are likely to succeed on the merits because the
      Attorney General is censoring their progesterone-therapy
      advocacy based on content and viewpoint ....................................25

II.   The Attorney General cannot justify censoring progesterone-
      therapy advocacy by labeling it "commercial" or
      "misleading." ....................................................................................26

      A.   The Centers' progesterone-therapy advocacy is not
           "commercial." ............................................................................27

           1.   The Centers' progesterone-therapy advocacy does
                not propose a commercial transaction ........................28

           2.   The *Bolger* factors are not satisfied by generic
                references to progesterone therapy that are
                motivated primarily by religious beliefs .....................28

                a.   The Centers' progesterone-therapy advocacy
                     lacks any reference to a specific product ...........29

                b.   The Centers' progesterone-therapy advocacy
                     lacks a "primary" economic motivation ..............31

      B.   The Centers' progesterone-therapy advocacy is not
           "misleading." ...........................................................................38

           1.   The First Amendment protects the Centers'
                advocacy as an opinion on matters of scientific
                debate ...............................................................................38

           2.   The Centers' progesterone-therapy advocacy
                accurately describes reliable data .............................42

                a.   "Abortion Pill Reversal" accurately describes
                     the use of progesterone to compete with and
                     reverse the intended effects of mifepristone ......44

                b.   Progesterone therapy is safe and effective
                     within the normal meaning of those terms ........48

      C.   The Attorney General cannot justify censoring
           progesterone-therapy advocacy under strict or
           intermediate scrutiny............................................................56

III.  The remaining preliminary injunction factors favor issuing
      the injunction ................................................................. 58

      A.    The Centers will suffer irreparable harm without an
            injunction................................................................ 58

      B.    The public interest and balance of equities strongly
            favor an injunction .............................................. 59

Conclusion ........................................................................... 60

Statement of Related Cases ................................................ 61

Certificate of Service .......................................................... 62

iv

# TABLE OF AUTHORITIES

## Cases

*American Academy of Pain Management v. Joseph*,
  353 F.3d 1099 (9th Cir. 2004) ................................................... 30, 31

*American Beverage Association v. City and County of San Francisco*,
  916 F.3d 749 (2019) ....................................................................... 59

*Ariix, LLC v. NutriSearch Corp.*,
  985 F.3d 1107 (9th Cir. 2021) ................................ 29, 32, 34, 35, 37

*Ashcroft v. ACLU*,
  535 U.S. 564 (2002) ...................................................................... 25

*Bernardo v. Planned Parenthood Federation of America*,
  115 Cal. App. 4th 322, 9 Cal. Rptr. 3d 197 (2004) ......................... 41

*Bolger v. Youngs Drug Products Corp.*,
  463 U.S. 60 (1983) ............................................... 20, 27, 29, 30, 37

*California Chamber of Commerce v. Council for Education &
  Research on Toxics*,
  29 F.4th 468 (9th Cir. 2022) ........................................ 23, 38, 50, 58

*California v. United States Department of Health & Human Services*,
  977 F.3d 801 (9th Cir. 2020) ......................................................... 14

*Central Hudson Gas & Electric Corp. v. Public Service Commission
  of New York*,
  447 U.S. 557 (1980) .............................................. 22, 27, 36, 37, 57

*Cornelio v. Connecticut*,
  32 F.4th 160 (2d Cir. 2022) ........................................................... 57

*Dex Media West, Inc. v. City of Seattle*,
  696 F.3d 952 (9th Cir. 2012) ........................................................ 27

*Edenfield v. Fane*,
  507 U.S. 761, 767 (1993) .............................................................. 57

*Enying Li v. Holder,*
    738 F.3d 1160 (9th Cir. 2013) ....................................................... 36

*Facenda v. N.F.L. Films, Inc.,*
    542 F.3d 1007 (3d Cir. 2008) ........................................................ 35

*Fellowship of Christian Athletes v. San Jose Unified School District*
    *Board of Education,*
    82 F.4th 664 (2023) ....................................................................... 59

*First Resort, Inc. v. Herrera,*
    860 F.3d 1263 (9th Cir. 2017) ....................................................... 33

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ...................................................................... 56

*Greater Baltimore Center for Pregnancy Concerns v. Mayor & City*
    *Council of Baltimore,*
    879 F.3d 101 (4th Cir. 2018) ................................................... 33, 36

*Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor &*
    *City Council of Baltimore,*
    721 F.3d 264 (4th Cir. 2013) ......................................................... 36

*Grocery Manufacturers Association v. Sorrell,*
    102 F. Supp. 3d 583 (D. Vt. 2015) ................................................ 43

*Hoye v. City of Oakland,*
    653 F.3d 835 (9th Cir. 2011) ......................................................... 57

*Ibanez v. Florida Department of Business & Professional Regulation,*
    *Board of Accountancy,*
    512 U.S. 136 (1994) ...................................................................... 43

*IMDb.com Inc. v. Becerra,*
    962 F.3d 1111 (9th Cir. 2020) ................................................. 22, 28

*Italian Colors Restaurant v. Becerra,*
    878 F.3d 1165 (9th Cir. 2018) ....................................................... 59

*Junior Sports Magazines, Inc. v. Bonta*,
    80 F.4th 1109 (9th Cir. 2023) ........................................................ 24

*Kuba v. 1-A Agricultural Association*,
    387 F.3d 850 (9th Cir. 2004) ........................................................ 57

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ........................................................ 14

*Meinecke v. City of Seattle*,
    99 F.4th 514 (9th Cir. 2024) ........................................................ 24, 25

*Mobilize the Message, LLC v. Bonta*,
    50 F.4th 928 (9th Cir. 2022) ........................................................ 24, 58

*National Institute for Family & Life Advocates v. James*,
    746 F.Supp.3d 100 (W.D.N.Y. 2024) ........................................ 3, 37

*National Institute of Family and Life Advocates v. Becerra*,
    585 U.S. 755 (2018) ........................................................ 14, 25, 60

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ........................................................ 29

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................ 59

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013) .................................. 38, 40, 41, 42, 45

*Peel v. Attorney Registration & Disciplinary Commission of Illinois*,
    496 U.S. 91 (1990) ........................................................ 54

*Planned Parenthood Arizona, Inc. v. Humble*,
    753 F.3d 905 (9th Cir. 2014) ........................................................ 59

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ........................................................ 22, 25

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988) ........................................................ 34

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) ........................................................................58

*Rosenberger v. Rector & Visitors of University of Virginia*,
  515 U.S. 819 (1995) ......................................................................25

*Sorrell v. IMS Health, Inc.*,
  564 U.S. 552 (2011) .................................................. 23, 25, 26, 56

*Stenberg v. Carhart*,
  530 U.S. 914 (2000) ......................................................................56

*Thompson v. Western States Medical Center*,
  535 U.S. 357 (2002) ......................................................................23

*Thunder Studios, Inc. v. Kazal*,
  13 F.4th 736 (9th Cir. 2021) ........................................................24

*Turner Broadcasting System, Inc. v. F.C.C.*,
  512 U.S. 622 (1994) ......................................................................26

*Underwager v. Salter*,
  22 F.3d 730 (7th Cir. 1994) ..........................................................41

*United States v. Caronia*,
  703 F.3d 149 (2d Cir. 2012)....................................................26, 59

*United States v. United Foods, Inc.*,
  533 U.S. 405 (2001) ......................................................................27

*Videtto v. Kellogg USA*,
  No. 2:08cv01324, 2009 WL 1439086 (E.D. Cal. May 21, 2009) .....47

*Wendell v. GlaxoSmithKline LLC*,
  858 F.3d 1227 (9th Cir. 2017) ......................................................41

*Werbel v. Pepsico, Inc.*,
  No. C09-04456, 2010 WL 2673860 (N.D. Cal. July 2, 2010) .........47

*Winter v. Natural Resources Defense Council*,
  555 U.S. 7 (2008) ..........................................................................25

## **Statutes**

28 U.S.C. § 1292(a)(1)...............................................................1

28 U.S.C. § 1331 .......................................................................1

28 U.S.C. § 1343 .......................................................................1

28 U.S.C. § 2107(a) ...................................................................1

42 U.S.C. § 1983 .......................................................................1

Cal. Bus. & Prof. Code § 17200, *et seq.* ..................................2

Cal. Bus. & Prof. Code § 17500, *et seq.* ..................................2

## STATEMENT OF JURISDICTION

National Institute of Family and Life Advocates ("NIFLA"), on behalf of itself and its members, and SCV Pregnancy Center ("SCV") (collectively "the Centers") filed this lawsuit in the United States District Court for the Central District of California under the Civil Rights Act of 1871, 42 U.S.C. § 1983, alleging violations of their First and Fourteenth Amendment rights. The district court exercised federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

On March 6, 2025, the district court denied Plaintiffs' motion for a preliminary injunction. 1-ER-025. Plaintiffs filed their appeal on April 7, 2025. 10-ER-2290. The appeal was filed within the 30-day period established in 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

SCV and other NIFLA members posted information on their social media pages for women who regret starting a chemical abortion and wish to save their baby's life. The information was based on published studies and involved progesterone therapy, known colloquially as "abortion pill reversal" or APR. The treatment is simple: taking supplemental progesterone—identical to the hormone that a woman's body naturally produces during pregnancy—to counteract the effects of mifepristone, the first drug used in a chemical abortion.

Some of the Centers offer pregnancy confirmation and prescriptions for progesterone if appropriate; others simply share information about the option. None charge any patient for APR information, pregnancy confirmations, or progesterone prescriptions.

But the Attorney General of California says sharing information about APR is illegal. He has sued similarly situated nonprofits for telling women about this option—claiming that using the very words "abortion pill reversal" violates California's Unfair Competition Law (UCL) and False Advertising Law (FAL) (Cal. Bus. & Prof'l Code §§ 17200, *et seq.* and 17500, *et seq.*). The Centers self-censored in light of this threat to their speech and filed this lawsuit, moving for an injunction to prevent the Attorney General from censoring their informational speech about APR.

A federal district court in New York granted an injunction in a virtually identical case last year. *See Nat'l Inst. for Family & Life Advocs. v. James*, 746 F.Supp.3d 100 (W.D.N.Y. 2024). But the district court below denied the injunction here.

This appeal raises the following issue: whether the Attorney General is likely violating the First Amendment by censoring the Centers' speech about progesterone therapy.

## PERTINENT STATUTES AND REGULATIONS

Pertinent constitutional provisions, statutes, regulations, and rules are attached as an addendum to this brief.

## INTRODUCTION

This case concerns truthful speech about progesterone therapy—a lawful, life-saving medical treatment that expands women's choice. Not all women who take mifepristone want to complete their chemical abortion. Some experience immediate regret, while others were tricked or forced into taking the drug against their will. Progesterone therapy offers these women hope and their babies a second chance at life.

No one knows this better than Atoria Foley and Desirae Exendine, two California mothers who immediately regretted taking mifepristone and frantically sought an alternative to completing their chemical abortions. 7-ER-1575–90. After searching for terms like "abortion pill reversal," Atoria and Desirae connected with a NIFLA-member— Alternatives Pregnancy Center. There, an OBGYN ran diagnostics, obtained informed consent, and prescribed progesterone treatment for free. *Id.* The treatment worked: Atoria gave birth to a healthy daughter, and Desirae to a healthy son. *Id.* Atoria testifies that, "if I hadn't heard about abortion pill reversal, I firmly believe my baby girl would not be alive today." 7-ER-1580. And Desirae adds, "I'm so grateful for Alternatives and the free services they provided to me. They gave me back my son's life. I believe all women should have the same second chance to save their babies." 7-ER-1588.

Yet Defendant-Appellee, the Attorney General, seeks to silence pregnancy centers who speak about this life-saving treatment and offer

5

a second chance to women like Atoria and Desirae. He targeted similarly situated California nonprofits for enforcement actions under the state's business-fraud statutes, alleging that their progesterone-therapy advocacy is false or misleading commercial speech. To avoid prosecution, the Centers here chilled their materially identical speech.

The Centers sued in federal court and moved for a preliminary injunction to vindicate their First Amendment rights to advocate for progesterone therapy. Although the Centers charge nothing for this therapy or any other service, and their advocacy for it is motivated by these nonprofits' religious beliefs in the value of unborn life, the court below denied the preliminary injunction. It concluded that the Centers are engaged in commercial speech and that such speech is unprotected because the studies supporting APR are not "credible." These holdings were in error. This Court should reverse.

## STATEMENT OF THE CASE

NIFLA is a faith-based nonprofit association of life-affirming pregnancy centers. 7-ER-1494. It empowers women and families to choose life for their unborn children by providing legal counsel, education, and training to its member centers. *Id.* NIFLA brings this suit to vindicate its and its member centers' rights. 7-ER-1497. One such member is Plaintiff-Appellant SCV Pregnancy Center, a religious nonprofit California corporation. SCV provides all its services to clients for free, motivated solely by its Christian mission to protect unborn life and serve mothers in need. 7-ER-1497–98.

NIFLA's member centers support women at many stages of motherhood, including women who are pregnant, postpartum, post-abortive, or even mid-abortion. 7-ER-1495. Some of these women regret their decision to begin the abortion-drug process, or have done so only under duress or by trick or force, and they seek to save their children's lives before their chemical abortions are complete. *Id.*, 7-ER-1510.

Progesterone therapy provides hope and help. Progesterone therapy is a lawful, life-saving medical treatment that aims to save the pregnancies of women who have taken the first abortion drug, mife-pristone, but change their mind before taking the second, misoprostol. By taking supplemental progesterone, these women can counteract the adverse effects of mifepristone and potentially save their unborn children. 7-ER-1510–11.

7

The Centers' religious faith compels them to help interested women save their children's lives by (1) publishing information about APR so that women know their options, and (2) for some centers, providing free access to doctors who can evaluate a woman and her unborn child and, if appropriate, proscribe progesterone. 7-ER-1495, 7-ER-1499, 7-ER-1531. Pursuant to their religious mission, the Centers provide all APR services for free. *Id.*

### A. Progesterone therapy works by using supplemental progesterone to counteract the effects of the abortion drug mifepristone.

Chemical abortion drugs work by "block[ing] a hormone called progesterone that is needed for a pregnancy to continue." 7-ER-1507. The current abortion-drug regimen consists of two drugs. First, mifepristone blocks a woman's progesterone receptors, cutting off oxygen and nutrition to her developing child and, in most cases, ending its life. 7-ER-1506–08. Normally taken two days later, misoprostol induces uterine contractions and expels the child from the womb. *Id.*

Progesterone is a naturally occurring hormone critical to maintaining a healthy pregnancy. 7-ER-1501–02. For over half a century, medical professionals have prescribed it "off-label" to treat various female fertility issues, including to prevent miscarriage or preterm birth and to facilitate in vitro fertilization. 7-ER-1502–06. Prescribing progesterone for APR is another such off-label use. 7-ER-1511.

Its basic premise is supported by a biochemical principle called "reversible competitive inhibition." 7-ER-1440–46. The treatment increases the concentration of progesterone (the "receptor agonist"), which can compete with and reverse the effects of mifepristone (the "receptor antagonist") so long as the mifepristone has not already achieved fetal demise. *Id.*

Thus, progesterone and mifepristone compete to bind to the same receptors. *Id.* The competition is proportional to the amount of each competing molecule. 7-ER-1443. Adding more progesterone allows it to compete with the mifepristone, bind to the receptors, and reverse the intended effects of the abortion drug by reinitiating the nutrients that mifepristone previously blocked. 7-ER-1440–46. Yale School of Medicine scientist Dr. Harvey Kliman—who favors expansive abortion rights—has explained that if one of his daughters accidentally took mifepristone during pregnancy, he would "tell her to take 200 milligrams of progesterone three times a day for several days." 7-ER-1515–16.

The process is similar to how Narcan is used to treat opioid overdoses. Narcan is an "opioid antagonist." 7-ER-1445, 2-ER-205–06. It is called an opioid "reversal" drug because it attaches to opioid receptors in the brain to reverse and block the effects of opioids.[1] *Id.*

---

[1] CDC, *Reverse Opioid Overdose to Prevent Death*, May 8, 2024, https://www.cdc.gov/overdose-prevention/reversing-overdose/index.html.

### B.     Progesterone therapy has been used for almost 20 years to save an estimated 6,000 babies after their mothers took mifepristone and then chose reversal.

The scientific literature demonstrates APR's ability to safely and effectively counteract the effects of mifepristone and increase the odds of delivering a full-term live baby.

*Animal Data.* In a 1989 study, researchers investigated "the role of progesterone in the maintenance of pregnancy" by studying groups of pregnant rats. 7-ER-1511, 9-ER-2028–42. Due to ethical and practical limitations of human studies, biomedical researchers often use rats as subjects because of their relative anatomical, physiological, and genetic similarity to humans. 7-ER-1511–12, 9-ER-2044. Using three groups—a control group, a mifepristone group, and a mifepristone-and-progesterone group—researchers concluded that while the progesterone levels of the mifepristone group "decreased significantly after 72 hours of administration," the rats in the mifepristone-*and*-progesterone group "remained within the levels of the control group." 9-ER-2028–29. In other words, when administered supplemental progesterone, the mifepristone had almost no effect on a female rat's natural progesterone levels. After four days, only a third of the mifepristone rats remained pregnant, while *all* the rats who received progesterone remained pregnant. *Id.*

A 2023 animal study produced similar results. 9-ER-2066–76. Researchers staggered the administration of the drugs to replicate how

10

progesterone is clinically administered to counteract mifepristone at similar gestational stages to human pregnancies. *Id.* Using the same three study groups as the 1989 study, researchers found that providing progesterone to rats after mifepristone "reverses the effects of the mifepristone, resulting in living offspring at the end of gestation in the majority (81.3%) of rats." 9-ER-2072. Administering progesterone resulted in a "clear reversal of the termination process." 9-ER-2074.

*Observational Studies.* The animal study results have been confirmed by human observational studies. A large 2018 case study followed women who took mifepristone but expressed interest in "reversing" its effects through progesterone therapy. 7-ER-1512. Researchers followed 754 pregnant women, 547 of whom met the inclusion criteria and underwent progesterone treatment within 72 hours of ingesting mifepristone. 9-ER-2054–55. For women who received progesterone intramuscularly, fetal survival was 64%. 9-ER-2055. For those who received an initial high dose of oral progesterone followed by daily oral progesterone during the first trimester, fetal survival was even higher: 68%. *Id.*

These survival rates are remarkable because they far exceed the 8 to 25% survival rate when mifepristone is used alone, without miso-prostol or supplemental progesterone. 9-ER-2053. And the study showed no increased risk of birth defects or preterm delivery. 9-ER-

11

2055. Researchers concluded that "[t]he use of progesterone to reverse the effects of the competitive progesterone receptor blocker, mifepristone, appears to be both safe and effective." 9-ER-2058.[2]

Multiple other smaller studies over the last decade have observed similar results, and a 2023 literature review of 16 studies that mapped the extent of existing research concluded that "[m]ifepristone antagonization with progesterone to avert medication abortion is a safe and effective treatment." 9-ER-2085. Further, the "continuing pregnancy rate after ingesting mifepristone alone is ≤25" percent but with progesterone therapy the rate "is 65 percent and 69 percent using the delivery regimens intramuscular injection and high-dose oral, respectively. There is no increased maternal or fetal risk from using bioidentical progesterone in early pregnancy." *Id.*

*Clinical Trials.* APR's use in emergent and morally fraught circumstances—when a woman changes her mind after taking mifepristone—makes it difficult to study the therapy via clinical trial. But one trial was conducted in women who had not changed their minds. That study was led by the Attorney General's own expert, Dr. Mitchell Creinin. And it, too, showed the efficacy of APR. Four of the

---

[2] A small 2012 case study found similar results. Of the six women who completed that study, four carried their pregnancies to term (67%) after receiving progesterone therapy. 9-ER-2061–65.

five women who received progesterone (80%) had continuing pregnancies. 9-ER-2061–65.

The Attorney General argues the study raises safety concerns. But the only two women who required medical intervention were in the control group—that is, they received mifepristone only and did *not* receive progesterone. 7-ER-1361. The only woman in the progesterone group who went to the hospital with heavy bleeding for a few hours while completing the chemical abortion required "no intervention." *Id.*

It has been almost 20 years since the first known progesterone-mediated reversal of an intended chemical abortion. 5-ER-773. Doctors have been advising women about the option of APR for over a decade, and it is estimated that over 6,000 babies have now been born because their mothers heard about this option and chose to reverse course.[3] What is true in theory is true in practice as well, and Atoria Foley and Desirae Exendine's beautiful, living children are a testament to that fact. 7-ER-1576–90.

---

[3] Abortion Pill Rescue Network, 2024 Impact Report, https://www.heartbeatinternational.org/images/HeartbeatServices/ImpactReports/APRN_Impact_Report_-_2024.pdf. *See also*, 7-ER-1515 (citing 2022 version of the *Impact Report*).

13

### C. The Attorney General censors progesterone therapy advocacy, continuing California's targeting of life-affirming pregnancy centers.

California has long targeted pro-life organizations in violation of the First Amendment. In *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 779 (2018) ("*NIFLA*"), the Supreme Court held that NIFLA on behalf of its members was likely to succeed in its First Amendment challenge to California's attempt to compel pregnancy centers to speak government-mandated messages about abortion. In *California v. United States Department of Health & Human Services*, 977 F.3d 801, 802 (9th Cir. 2020), the state led a coalition suing to force pro-life organizations like Little Sisters of the Poor and March for Life to cover abortifacient contraceptives. *Cf. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 687 (2020).

Here too, the Attorney General is targeting pregnancy centers for disfavored treatment because of their faith-based, pro-life views. He brags that "[s]upporting, expanding, and protecting" abortion is "a top priority." 9-ER-2118–22, 9-ER-2123–25. But pregnancy centers' pro-life efforts counteract his pro-abortion mission. So the Attorney General announced that it is "time" to push back against pro-life efforts with a "ruthless, coordinated siege." 9-ER-2126–29.

To execute that plan, the Attorney General sued pro-life nonprofit organizations for their speech about APR. 7-ER-1591–621. Invoking California's business-fraud laws, he filed an enforcement action against

14

groups of pregnancy centers that speak about APR and operate an APR hotline and informational website. *Id.* Compl., *People v. Heartbeat Int'l*, No. 23CV044940, ¶¶ 9–11 (Cal. Super. Ct., Alameda Cnty, Sept. 21, 2023). He deemed "untrue and misleading" factually accurate statements that APR can "reverse" the effects of mifepristone, is "effective," "has been shown to increase the chances of allowing the pregnancy to continue," has a 64 to 68% success rate, and does not increase the risk of birth defects. *Id.* ¶¶ 97, 100. He says using the word "reversal" to refer to progesterone therapy is inherently false and misleading. 7-ER-1608. He even claims that any suggestion that APR is "safe" or "effective"—including references to the published studies above showing effective rates up to 68%—are inherently false and misleading. *Id.*

Filing that lawsuit, the Attorney General was open about his hostility to pro-life centers. He admitted that he found it "horrifying" that "right now there are more crisis pregnancy centers in California than abortion care clinics." 9-ER-2141, lodged at 7-ER-1488, 9:17–9:25.[4] In an accompanying press release, the Attorney General argued that pregnancy centers were not "*real* reproductive healthcare facilities" because they do not provide abortions. 9-ER-2141, 10:15–10:22.

---

[4] Also available at, California Dept. of Justice, *Attorney General Bonta Announces Legal Action to Protect Reproductive Freedom and Transparency*, (Sept. 21, 2023), https://www.youtube.com/watch?v=_kOyqRQ9EtU.

This hostility is nothing new. The year before, he issued a consumer alert "WARNING" Californians that pro-life pregnancy centers "seek to discourage people facing unintended pregnancies from … abortion." 9-ER-2130–32. He asserted falsely that the centers "do not provide comprehensive reproductive healthcare" because they "do not provide abortion or abortion referral." *Id.* (emphasis removed).

At bottom, the Attorney General opposes pregnancy centers because he believes they "attempt to discourage people facing unintended pregnancies from … abortion." 9-ER-2134.

After suing Heartbeat and RealOptions to censor their APR speech, the Attorney General spearheaded an open letter signed by 15 other state attorneys general decrying the proliferation of "anti-abortion crisis pregnancy centers." 9-ER-2143. The letter accused pregnancy centers of using "deceptive tactics to lure in patients" and praised Yelp's discrimination against these organizations. 9-ER-2145, 9-ER-2150. The Attorney General pledged to use his consumer-protection authority to "take numerous actions aiming to mitigate [pregnancy centers'] harmful effects." 9-ER-2150. Yet the Attorney General has never identified a single person actually misled or harmed by pro-life pregnancy organizations' speech about APR.

16

### D. The Centers' progesterone-therapy advocacy is chilled, and they move for a preliminary injunction.

The Centers here have made statements similar to those of the organizations the Attorney General sued. They chilled their own speech to avoid similar prosecution.

NIFLA and many of its members—including SCV and Alternatives—have used their social media platforms and other forms of communication to publicize the results of scientific studies on APR and express their opinion, consistent with those studies, that progesterone treatment is a safe and effective option for women who have taken the first abortion pill but regret it. 7-ER-1522–34. SCV does not offer any services related to APR itself, but it wishes to continue advocating for this life-saving option on its website and social media. *Id.* Alternatives advocates for and provides evaluations for APR, among other women's healthcare services. 7-ER-1525–27. Motivated by faith rather than profit, NIFLA members provide all their services for free. 7-ER-1495.

But because of the Attorney General's prosecution of other organizations in California, the Centers have been forced to chill their own speech about APR. SCV, for example, had to take down social media posts that say, "There is an effective process called abortion pill reversal that can reverse the effects of the abortion pill and allow you to continue your pregnancy, but time is of the essence. If you are interested in starting the abortion pill reversal process, call (877) 558-

17

0333 or visit abortionpillreversal.com." 7-ER-1533, 9-ER-2117. Alternatives used to post regularly about APR on its social media accounts, but it has stopped because of the Attorney General's censorship campaign. 7-ER-1525–27.

Another NIFLA member, which does not currently offer any APR services, did not renew its bench advertisements that simply read: "Free Pregnancy Clinics – It's not too late – AbortionPillReversal.com." 7-ER-1525, 9-ER-2091–105. Additional examples of censored statements are available at 9-ER-2106–117.

The Centers sued to vindicate their First Amendment rights to free speech and free exercise to tell women like Atoria Foley and Desirae Exendine about the possibility of progesterone therapy, and to secure their Fourteenth Amendment due process right not to be subject to vague and ad hoc speech restrictions.

The Centers moved for a preliminary injunction on their free speech claim. 7-ER-1395–400. In support, the Centers submitted a Verified Complaint describing the informational speech the Attorney General has censored, 7-ER-1489–574; studies showing that progesterone is safe, 8-ER-1635–9-ER-1957, and that APR has been used safely and effectively for almost 20 years, 9-ER-1958–2090; expert declarations of Dr. Susan Bane, 7-ER-1432–83 and 2-ER-191–211; declarations of additional NIFLA member centers, 9-ER-2091–105; and

18

the above-referenced declarations of Atoria Foley and Desirae Exendine, women who heard about APR through NIFLA members in California and successfully used it to save their babies after taking the first abortion drug, 7-ER-1575–90.

In defense, the Attorney General argued that the Centers' speech is unprotected false commercial speech. 7-ER-1367–94. The Attorney General did not demonstrate that the nonprofits are motivated by anything other than their desire to help women who are desperately looking for an option to save their babies after taking (or being forced to take) the first abortion drug. Nor did he provide any evidence that the Centers receive any economic benefit from telling women about APR. He simply speculated that some centers might receive more donations based on their APR advocacy. 7-ER-1381, 7-ER-1385.

Further, the Attorney General disputes the reliability of the studies that support APR. 7-ER-1386–89. He does not dispute that not taking the second abortion drug, misoprostol, increases the chance that the unborn child will survive, but argues that the studies showing increased chances of survival by adding progesterone are not "credible." 7-ER-1378. As a result, he says, the Centers' speech about those studies is inherently false and misleading and completely unprotected. 7-ER-1382–83.

19

### E.    The district court denies the Centers' motion for a preliminary injunction.

On March 6, 2025, the district court issued an opinion denying the motion for preliminary injunction. 1-ER-002–025. The court adopted the Attorney General's position but went even further, finding that even if the speech is protected, the Attorney General could meet intermediate scrutiny to justify censoring it—an argument the Attorney General never made. *Compare* 1-ER-020–22 *with* 7-ER-1367–94 (not arguing any standard of scrutiny is met).

The district court held that Plaintiffs' statements were unprotected false and misleading commercial speech. Even though the Centers' APR advocacy does not propose a commercial transaction, the district court proceeded to analyze the three factors set forth in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983). The court concluded that the Centers' generic references to progesterone-therapy advocacy advertised a specific product ("medical services"). 1-ER-009. It made no finding that the speech was *motivated*, let alone primarily motivated, by any alleged economic benefits. It held that because NIFLA advises its members about APR, and its members pay a membership fee, then APR advocacy must be commercial. 1-ER-009–10. *Id.* The court also assumed—without any evidence—that the Centers relied on their progesterone-therapy advocacy in grant fundraising. *Id.*

20

The court also adopted the Attorney General's position that the word "reversal" is inherently false and misleading even though studies use it to describe APR, and the CDC and the state of California use "reversal" to describe the similar biochemical process used by Narcan for opioid overdose reversal. 1-ER-014. In addition, the court dug through the peer-reviewed studies supporting APR and concluded that each of them was somehow flawed and unable to support the opinion that APR is safe and effective, contrary to the position of the Centers' expert. 1-ER-014–20.

The Centers appealed.

## SUMMARY OF ARGUMENT

The Attorney General is censoring the Centers' progesterone-therapy advocacy based on content and viewpoint. Such speech restrictions are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). To justify this censorship, the Attorney General must demonstrate either that the restricted speech is unprotected or that his restriction satisfies heightened scrutiny. *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1120–22 (9th Cir. 2020). He can do neither.

The Attorney General argues that the Centers' progesterone-therapy advocacy is false or misleading commercial speech and falls into the category of unprotected speech recognized in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). That's wrong. The Centers' statements do not meet any test for commercial speech. They neither propose a transaction nor do they advertise a specific product based primarily on economic motivations. And the Attorney General has not shown otherwise. Motivated by faith, the Centers advocate for a lawful, life-saving treatment that is provided at no cost to women, often by outside physicians and pharmacists. This is fully protected noncommercial speech.

Further, the Attorney General presents no evidence that the Centers' advocacy about progesterone therapy is false or misleading— he merely disputes the reliability of the peer-reviewed medical studies.

22

In the almost 20 years that progesterone therapy has been used for APR, the Attorney General has not identified a single person misled by the Centers' progesterone-therapy advocacy. For good reason. The Centers' advocacy and informational statements are accurate recitals of scientific opinions derived from published peer-reviewed studies. And the speech is consistent with the position of professional medical organizations—though other professional organizations with opposing ideologies dispute the evidence. The district court erred by taking sides in a scientific debate and allowing the Attorney General to censor the Centers from sharing the scientific opinion that progesterone therapy is safe and effective. *See Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022).

The Attorney General waived any attempt to satisfy heightened scrutiny—whether strict or intermediate. Nor can he. The government has neither a compelling nor a substantial interest in insulating Californians from speech with which it disagrees. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 580 (2011). And blanket censorship neither satisfies the direct-advancement requirement nor is it narrowly tailored. "[R]egulating speech must be a last—not first—resort,'" and yet, here, "it seems to have been the first strategy the Government thought to try." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).

23

The Centers are entitled to a preliminary injunction to protect their free-speech rights. They are likely to succeed on the merits of that claim and will suffer irreparable harm absent an injunction, which serves the public interest by protecting the free flow of information. And given the lack of evidence that anyone has been harmed by progesterone therapy, the balance of equities tips decisively in the Centers' favor. This Court should reverse and remand for entry of a preliminary injunction.

## STANDARD OF REVIEW

Because injunctions involve the weighing of multiple factors, this Court reviews preliminary-injunction denials generally for abuse of discretion, though it reviews the underlying legal principles de novo. *Mobilize the Message, LLC v. Bonta*, 50 F.4th 928, 934 (9th Cir. 2022). In First Amendment cases, this Court also reviews factual findings de novo. *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1115 (9th Cir. 2023); *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) ("In First Amendment cases, we make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.") (quoting *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021)).

To obtain a preliminary injunction, the Centers must establish (1) that they will likely succeed on the merits, (2) that they will likely

24

suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Likelihood of success is the "most important" factor in cases like this one. *Meinecke*, 99 F.4th at 521.

## ARGUMENT

### I. The Centers are likely to succeed on the merits because the Attorney General is censoring their progesterone-therapy advocacy based on content and viewpoint.

The First Amendment "prohibits laws that abridge the freedom of speech." *NIFLA,* 585 U.S. at 766. This "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotation omitted). Rather, "it is all but dispositive" for a court to conclude that the enforcement of a law is content- or viewpoint-based. *Sorrell*, 564 U.S. at 571. Either is "presumptively unconstitutional." *Reed,* 576 U.S. at 163.

Here, the Attorney General's threatened enforcement action is both content and viewpoint-based. It is content-based because it would "target speech based on its communicative content." *Ibid*. And it is viewpoint-based because it targets "particular views taken by speakers on a subject," punishing speech that supports progesterone therapy while protecting speech that opposes it. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also United States v.*

25

*Caronia*, 703 F.3d 149, 165 (2d Cir. 2012) (holding that "to prohibit off-label promotion [of a pharmaceutical] … distinguishes between favored speech and disfavored speech on the basis of the ideas or views expressed") (cleaned up).

Because the Attorney General "stifles speech on account of its message," his actions "pose the inherent risk that the Government seeks … to suppress unpopular ideas or information or manipulate public debate through coercion rather than persuasion." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). Indeed, the record is replete with evidence of the Attorney General's hostility toward the Centers' life-affirming speech. 7-ER-1537–41 (finding it "horrifying" that pro-life centers offering resources to women outnumber abortion clinics in California); 9-ER-2138 (publicly announcing he was suing an "anti-abortion group"). It is particularly dangerous for the government to censor such debate "in the fields of medicine and public health, where information can save lives." *Sorrell*, 564 U.S. at 566.

## II. The Attorney General cannot justify censoring progesterone-therapy advocacy by labeling it "commercial" or "misleading."

The Attorney General argues that his content- and viewpoint-based restriction of progesterone-therapy advocacy does not run afoul of the First Amendment because such speech is (1) commercial and (2) false or misleading. He is wrong on both points.

26

## A. The Centers' progesterone-therapy advocacy is not "commercial."

Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson*, 447 U.S. at 561. It is speech that "does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). Because commercial speech is "the offspring of economic self-interest," courts consider it "a hardy breed of expression that is not particularly susceptible to being crushed by overbroad regulation." *Cent. Hudson*, 447 U.S. at 564 n.6 (cleaned up).

When speech "contain[s] components of both commercial and noncommercial speech," it may present a "close question" whether the "publication as a whole constitutes commercial speech." *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 957 (9th Cir. 2012) (citing *Bolger*, 463 U.S. at 66–67). In such cases, courts consider the *Bolger* factors: whether the communication has (1) an "advertising format," (2) a "reference to a specific product," and (3) an "economic motivation." *Dex Media W.*, 696 F.3d at 957–58 (citing *Bolger*, 463 U.S. at 66–67). While one of these characteristics, standing alone, is insufficient, "*all* [three] characteristics" taken together "provide[] strong support for the … conclusion that the [speech is] properly characterized as commercial." *Bolger*, 463 U.S. at 66–67.

27

### 1. The Centers' progesterone-therapy advocacy does not propose a commercial transaction.

At the outset, because the Centers' progesterone-therapy advocacy does not "propose a commercial transaction," this Court "need not reach the *Bolger* factors." *IMDb.com Inc.*, 962 F.3d at 1122 (cleaned up). Those factors apply only when the question is "close." *Ibid.* The Centers, motivated solely by their moral and religious interests in saving lives and helping mothers who regret taking mifepristone, provide information on progesterone therapy and advocate for its use. 7-ER-1531. But they do not sell progesterone. Some, like SCV, *only* advocate for its use by publishing informational statements—they do not offer any service related to progesterone therapy. 7-ER-1531–34; *see also* 7-ER-1523–25. Other Centers, like Alternatives, both publish information and offer access to licensed medical professionals who can explore treatment options and, if appropriate, prescribe progesterone—at no cost to the women. 7-ER-1525–27, 9-ER-2097–101, 7-ER-1575–90. Such speech is pure advocacy on a matter of public concern, not commercial speech, and is therefore entitled to the utmost First Amendment protection.

### 2. The *Bolger* factors are not satisfied by generic references to progesterone therapy that are motivated primarily by religious beliefs.

The *Bolger* factors yield the same result. Even if the Centers' statements advocating for the use of progesterone therapy could be

considered nontraditional advertisements,[5] a communication's status as an advertisement "clearly does not compel the conclusion that [it is] commercial speech." *Bolger*, 463 U.S. at 66 (citing *N.Y. Times Co.*, 376 U.S. at 265–66). And the Centers' advocacy neither references a specific product nor is driven by any economic interests, much less primarily so.

### a.  The Centers' progesterone-therapy advocacy lacks any reference to a specific product.

The Centers' statements merely inform women about a general method of medical treatment that is prescribed by a doctor (pro bono if from one of the Centers) and filled by a third-party pharmacy. Indeed, progesterone therapy can involve a variety of administration methods and employs medication that is sold in several forms by various pharmaceutical companies. Such a general reference to a method of medical treatment is not a "reference to a specific product" under *Bolger*.

There, the Supreme Court contrasted the pamphlets' "specific[]" product references to "Trojan-brand condoms manufactured by appellee," with "generic[]" references to condoms more generally that

---

[5] Although the Center's advocacy appears outside "a traditional advertising format" (that is, in a communication without "price or availability information listed"), *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116–17 (9th Cir. 2021), the Supreme Court has broadly used the term "advertisement" to refer to "the promulgation of information and ideas by persons," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964).

lacked "any specific reference to those manufactured by appellee" or any other brand. *Bolger*, 463 U.S. at 66 n.13. Generic references, the Supreme Court explained, could support a finding of commercial speech in only two circumstances: when included in the advertisements of "a company with sufficient control of the market for a product [that it] may be able to promote [its] product without reference to specific brand names," or when included in "a trade association['s]" advertisements promoting a generic product for the economic benefit of many brands across an industry. *Id.*

Neither rationale for finding a generic reference sufficient exists here. The Centers do not participate in the progesterone market, much less control it, and they are not a trade association that profits by promoting progesterone. The district court nevertheless concluded that the Centers' progesterone-therapy advocacy satisfies the second *Bolger* factor because "a medical treatment is … a product." 1-ER-009. But the Centers' "generic references" to progesterone are not enough. *Bolger*, 463 U.S. at 66 n.13.

The district court read this Court's decision in *American Academy of Pain Management v. Joseph*, 353 F.3d 1099 (9th Cir. 2004) to mean that *Bolger*'s "specific product" test is met simply by the advertising of "medical services." 1-ER-009. That can't be right. General speech about generic medical treatments is not the same thing as referencing a

30

"specific product." In *Joseph*, this Court merely held that "licensed physicians and surgeons" engaged in commercial speech in "*their advertising*" of *their own specific* medical services (which, of course, they sold for profit). *Id.* at 1106 (emphasis added) (cleaned up). The regulated advertisements included a specific doctor's name, address, telephone number, board certifications, fees charged, etc., and they were limited to promoting that *specific* doctor's services. Here social media posts that the Attorney General argues are commercial point interested parties to a third-party website—AbortionPillReversal.com— not to the Centers' services. *See* 9-ER-2091–117. The specific advertising of a particular doctor's services in *Joseph* is a far cry from speech informing women about the availability of a generic medical treatment that can be provided free of charge by unidentified third-party physicians who prescribe different brands and forms of progesterone manufactured and sold by various third-party pharmaceutical companies.

Because the Centers' progesterone-therapy advocacy lacks any reference to a "specific product," the second *Bolger* factor is not satisfied.

> **b.    The Centers' progesterone-therapy advocacy lacks a "primary" economic motivation.**

The lower court also erred in finding the third *Bolger* factor—"an economic motivation"—satisfied. The "crux" of the economic-motivation

31

analysis is not the mere existence of a benefit but the degree to which that benefit *motivates* the speech. *Ariix*, 985 F.3d at 1117. To serve as "an adequate economic motivation," a financial benefit must be "the *primary* purpose for speaking." *Id.* (emphasis added). Here, the Centers lack an economic motivation for their progesterone-therapy advocacy, much less the "primary" motivation that the law requires. The district court gestured towards three economic motivations. None are sufficient.

*NIFLA dues.* The district court first suggested that NIFLA might have an economic incentive because it collects dues from members. 1-ER-009–10. As an initial matter, membership fees collected by NIFLA pose an economic *cost*, not benefit, to Plaintiff SCV and every other NIFLA member. Such fees provide zero basis to conclude that NIFLA *members'* speech is commercial and no grounds for the Attorney General to regulate their speech to women. As for NIFLA, while fees may enable the non-profit to serve members, those services are provided to further the pro-life mission of NIFLA and its members, not out of "an economic motivation" to earn fees. *Ariix*, 985 F.3d at 1116.

*Grant fundraising.* The district court also found economic benefit in the Centers' alleged "engage[ment] in grant fundraising based, in part, on their APR advocacy." 1-ER-009–010. This was error. There is no record evidence that NIFLA or its members "engage in grant fundraising based … on their APR advocacy." *Id.* The district court was

wrong to suggest that the Centers do not dispute such fundraising. 1-ER-010. While the Attorney General never made the grant fundraising argument, 7-ER-1385–86—so the Centers had no reason to address it specifically—the Centers vigorously disputed *any* economic motivation for their APR speech, 2-ER-180.

The lower court also erred by applying *First Resort*. 1-ER-009–10 n.8. There, this Court found a sufficient economic motivation for the plaintiff's advertisements seeking new clients for its services because it admitted that the employees' compensation and a "majority of [the plaintiff's] fundraising" turned on "the number of new clients" it served.[6] *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1273 (9th Cir. 2017). Employee compensation is not tied to the Centers' progesterone-therapy advocacy. And to the extent any of the Centers' fundraising turns on its promotion of progesterone therapy—there is no evidence in the record that this is the case—the impact would be minimal. At the very least, progesterone-therapy advocacy is not responsible for a "majority" of the Centers' fundraising. *Id.*

---

[6] Notably, in the second iteration of *Greater Baltimore Center for Pregnancy Concerns v. Mayor & City Council of Baltimore*, a case relied on by this Court in *First Resort*, the Fourth Circuit concluded that any connection between clientele numbers and fundraising is "too attenuated" to establish an "economic motivation" on the part of nonprofits. 879 F.3d 101, 109 (4th Cir. 2018).

33

In waving away the substantial disparities between this case and *First Resort*, the district court suggested that the employee compensation in *First Resort* was immaterial to the Court's decision. 1-ER-009–10 n.8. But that reading of *First Resort* renders it at odds with the U.S. Supreme Court's decision in *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988). There, the Court held that charitable solicitation could *not* be considered commercial speech despite the nonprofit's economic interest in raising funds. It would be beyond strange if a nonprofit's communications could pass as commercial speech *solely* based on their indirect benefit to fundraising, while the nonprofit's actual fundraising could not.

The district court's reading of *First Resort* also conflicts with how this Court characterized that decision in *Ariix*. There, the Court discussed the possibility that "indirect" economic benefits could satisfy the third *Bolger* factor so long as they were the "*primary* purpose for speaking," invoking *First Resort's* employee-compensation benefit as an example. *Ariix*, 985 F.3d at 1117 (emphasis added). Meanwhile, the *Ariix* Court made no mention of the fundraising benefit in *First Resort*, which casts serious doubt on the district court's treatment of that benefit as dispositive to that decision.

*General product exposure.* Finally, the district court posited that "general [product] exposure" might be a sufficient economic benefit

34

pointing to *Ariix*'s citation of *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008). 1-ER-009–10 n.8 (citing *Ariix*, 985 F.3d at 117). But in *Facenda*, such exposure was economically motivated because the speaker *sold* the product being exposed. 542 F.3d at 1017. The Centers don't sell progesterone. So while increased exposure of this general medical treatment may be an indirect economic benefit for manufacturers and distributors of progesterone, it bears no such relation to the Centers who seek, not to turn profits, but to save lives.

In sum, none of the district court's economic-benefit theories pan out. Even if the Attorney General could identify a legitimate economic motivation for the Centers' speech (he cannot), it would still come up short because it would not be their "*primary* purpose for speaking." *Ariix*, 985 F.3d at 1117 (emphasis added). Neither the district court nor the Attorney General have suggested that the Centers are primarily motivated by economic interests. For good reason. As pro-life faith-based nonprofits, they are motivated by their moral and religious convictions to tell women about the life-saving possibilities of progesterone therapy. 7-ER-1495, 7-ER-1499.

Finally, perhaps recognizing the shortcomings of its economic motivation analysis, the district court advanced the radical position that it need not even analyze *Bolger*'s economic-motivation factor. 1-ER-009 n.7. It relied on a single line of dictum from *First Resort* that

35

suggested economic motivation might be dispensable to the commercial-speech analysis. *Id.* ("'Thus, regardless of whether [the pregnancy centers] have an economic motivation in advertising, their regulated speech can still be classified as commercial.'").[7] Yet Supreme Court precedent makes clear that economic motivation is the heart of commercial speech doctrine. *Cent. Hudson*, 447 U.S. at 561.[8]

This *First Resort* dictum need not bind this Court for it is not "[w]ell-reasoned." *Enying Li v. Holder*, 738 F.3d 1160, 1164 n.2 (9th Cir. 2013). It is unaccompanied by any reasoning and supported only by a citation to dictum in a Fourth Circuit decision that has since been abrogated by that court. *Compare Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 285–86 (4th Cir. 2013) (en banc) (remanding for further record development regarding plaintiffs' potential economic motivations for speaking), *with Greater Balt. Ctr. for Pregnancy Concerns, Inc.*, 879 F.3d at 109

---

[7] The district court attributed this quote to *Joseph*, 353, F.3d at 1108–09, but that appears to be a scrivener's error. The quoted language—which expressly refers to pregnancy centers ("LSPCs") not at issue in *Joseph*—is not found anywhere in the decision. Nor is any language that could support the district court's proposition that economic motivation is unnecessary for commercial speech.

[8] To the extent *First Resort* is read to apply to speech that does not propose a commercial transaction, as here, it is wrongly decided and the Centers preserve that issue. *Cf. Cent. Hudson*, 447 U.S. at 562 (commercial speech is that which "propos[es] a commercial transaction.").

36

(affirming the centrality of economic motivation, holding that a center's "advertise[ments]" for "its services, some of which have commercial value in other contexts," were noncommercial because "the record gives no indication that the Center harbors an 'economic motivation'" (cleaned up)). Indeed, in *Ariix* this Court already declined to follow that poorly reasoned dictum when it held that "[a] publication that is not in a traditional advertising format but that still refers to a specific product can either be commercial" or "fully protected" based on the economic motivations at issue. 985 F.3d at 1116.

To be sure, *Bolger* left open the possibility that speech could be considered "commercial" even if it did not meet *all three Bolger* factors. 463 U.S. at 67 n.14. But it never purported to gut the core economic-interest component of commercial speech. *Cent. Hudson,* 447 U.S. at 561; *id.* at 564 n.6 (referring to commercial speech as "the offspring of economic self-interest").

The Centers' progesterone-therapy advocacy neither proposes a transaction nor bears any relation to the economic interests of the Centers or the women they serve. It also appears outside a traditional advertising format without a specific product reference, and its motivations are primarily religious and moral, not economic. "Nothing could be fundamentally less commercial than this speech about how a woman might save her pregnancy." *James*, 746 F. Supp. 3d at 121.

37

### B. The Centers' progesterone-therapy advocacy is not "misleading."

The Centers' speech accurately reflects published scientific data. The Attorney General debates the reliability of that data. But that just confirms its protection under the First Amendment, which protects opinions on matters of scientific debate. The Attorney General's disagreement with the published data also does not remove it from the First Amendment's protective sphere.

### 1. The First Amendment protects the Centers' advocacy as an opinion on matters of scientific debate.

The Free Speech Clause prohibits the Attorney General from labeling the Centers' progesterone-therapy statements as "false" or "misleading," because they accurately reflect scientific opinions on one side of a legitimate, ongoing scientific debate. *See ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013); *see also Cal. Chamber of Com.*, 29 F.4th at 478 (affirming a preliminary injunction of a Proposition 65 disclosure mandate, because the compelled speech reflected scientific "opinions," not "factual and uncontroversial information," and thus "elevate[d] one side of a legitimately unresolved scientific debate about whether eating foods and drinks containing acrylamide increases the risk of cancer"). The Centers want to publish or republish statements like the following:

38

- "Science shows that Abortion Pill Reversal can be a second chance at choice. A new Abortion Pill Reversal Study has been published in a peer-reviewed journal. Its findings showed that the reversal success rates were 64%–68%. There was also no increased risk of birth defects or preterm birth." 7-ER-1526, 9-ER-2103 (Alternatives Pregnancy Center Facebook Post).

- "'I want to choose Abortion Pill Reversal. What should I do now?' Talk with a hotline nurse at 877-558-0333. They will help you by answering basic questions to see if reversal is possible. The nurse will then connect you with a doctor or medical provider in your area to start treatment, if that is your choice…. More APR questions and answers on abortionpillreversal.com." 7-ER-1526 (Alternatives Pregnancy Center Facebook Post).

- "There is an effective process called abortion pill reversal that can reverse the effects of the abortion pill and allow you to continue your pregnancy, but time is of the essence." 7-ER-1533, 9-ER-2114–17 (SCV Pregnancy Center Facebook and Instagram posts).

These statements are supported by published, peer-reviewed studies. For example, the largest case study (including over 547 women)

39

concluded that "[i]ntramuscular progesterone and high dose oral progesterone were the most effective with reversal rates of 64% (P < 0.001) and 68% (P < 0.001), respectively. There was no apparent increased risk of birth defects .... The reversal of the effects of mifepristone using progesterone is safe and effective." 9-ER-2051. The First Amendment protects the Centers' right to accurately describe and publish information from this and other studies.

In asserting that the Centers' restatement of these studies' conclusions is false or misleading, neither the Attorney General nor the court below argued that the Centers "distorted [scientific studies'] findings," but rather that they "present[ed] accurately [studies'] allegedly inaccurate conclusions." *ONY,* 720 F.3d at 499. Indeed, the Centers' statements that progesterone therapy is "safe and effective" and that it can "reverse the abortion pill" or its "process" merely *quote* conclusions published in peer-reviewed scientific literature. *See* 9-ER-2051 ("The reversal of the effects of mifepristone using progesterone is safe and effective."); 9-ER-2085 ("Mifepristone antagonization with progesterone to avert medication abortion is a safe and effective treatment."); 9-ER-2074 (Progesterone administration can result in the "clear reversal of the termination process."); 9-ER-2072 (Progesterone "reverses the effects of the mifepristone."). The Attorney General just doesn't like those conclusions.

40

When it comes to certain areas of ongoing research, like those pertaining to progesterone therapy, scientific opinions "may be highly controversial and subject to rigorous debate by qualified experts. Needless to say, courts are ill-equipped to undertake to referee such controversies." *ONY*, 720 F.3d at 497; *see also Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) (Easterbrook, J.) ("Scientific controversies must be settled by the methods of science rather than by the methods of litigation.").

For these reasons, California courts have held the UCL and FAL do not even apply to "statements of opinion to the general public" about scientific disputes related to abortion. *Bernardo v. Planned Parenthood Fed'n of Am.*, 115 Cal. App. 4th 322, 349, 9 Cal. Rptr. 3d 197, 220 (2004). And the statements at issue are opinions, though supported by data: "'safe and effective' are not black and white scientific terms. They are matters of opinion and are often used (as in the case of chemical abortion, or APR) ... in light of the patient's specific needs and other potential options or risks." 2-ER-199 (expert report of Dr. Susan Bane).

The Attorney General, for example, touts mifepristone as "incredibly safe," and "incredibly effective," 7-ER-1593 (even "safer than ... Tylenol"), despite its black box FDA label—"the strongest possible warning" on a drug label, *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1238 n.7 (9th Cir. 2017)—that "serious and sometimes

41

fatal infections or bleeding" may occur, 7-ER-1424, 9-ER-1991–2010. If an abortion clinic made those same statements, like Planned Parenthood does, 10-ER-2194, a pro-life Attorney General could censor them using the same theory as the Attorney General here. (That case would be much easier for an attorney general to prove, because abortion clinics sell mifepristone, satisfying the commercial-speech test.) Although the government has no place in moderating such debates, the Attorney General is using the UCL and FAL to put the government's thumb on one side of the scale and censor the opposite point of view.

But while the Attorney General may have his opinion, advocates for progesterone therapy should be free to share theirs: "to the extent a speaker or author draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement," those conclusions are protected by the First Amendment. *ONY*, 720 F.3d at 498.

### 2. The Centers' progesterone-therapy advocacy accurately describes reliable data.

The lower court erred in holding that the Centers' statements regarding APR are "inherently false and misleading." 1-ER-011. Those statements of opinion regarding the safety and efficacy of progesterone therapy are accurate. Indeed, the Attorney General did not argue, and

42

the lower court did not find, that the Centers misdescribed any study but only questioned the "credibility" of the studies themselves.

It is now almost 20 years since the first successful APR treatment, 5-ER-773, and it is estimated that over 6,000 babies have been born after their mothers used APR.[9] Yet the Attorney General has not identified even one individual allegedly harmed by hearing about, or receiving, progesterone therapy. He has failed to cite "any evidence of deception," *Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*, 512 U.S. 136, 145 (1994) (cleaned up), or anything that makes it "likely" a "reasonable consumer would be deceived" or misled, *Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 641 (D. Vt. 2015) ("restrictions on commercial speech to prevent consumer deception should be limited to those instances when actual deception is likely, or when a reasonable consumer would be deceived."). And the Attorney General's "concern about the possibility of deception in hypothetical cases is not sufficient to rebut the constitutional presumption favoring disclosure over concealment." *Ibanez*, 512 U.S. at 145 (cleaned up). Despite this lack of evidence, the district court mischaracterized the supporting science, while invoking as authoritative the speech of pro-abortion organizations on the opposite side of the APR debate. These attempts to paint the Centers' statements as false or misleading fall short.

---

[9] 2024 Impact Report, *supra* note 3.

43

Specifically, the district court made three findings: "APR is not abortion reversal"; "[t]here is no credible scientific evidence that APR is safe"; and "[t]here is no credible scientific evidence that APR is effective." 1-ER-014–016. Each finding is contradicted by the record.

### a. "Abortion Pill Reversal" accurately describes the use of progesterone to compete with and reverse the intended effects of mifepristone.

For two reasons, the district court erred in concluding that the use of the word "reversal" is necessarily misleading. First, the word "reversal" accurately describes the scientific literature on the topic. 2-ER-204–05. Indeed, "reversal" is used in the titles of at least four studies on the progesterone therapy and in the text of more:

- George Delgado & Mary L. Davenport, *Progesterone Use to Reverse the Effects of Mifepristone*, 46(12) Annals Pharmacotherapy (2012); 9-ER-2061–65.

- Daniel Grossman, et al., *Continuing Pregnancy after Mifepristone and "Reversal" of First-Trimester Medical Abortion: A Systematic Review*, 92 Contraception 206–211 (2015); 4-ER-700–06.

- George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33(1) Issues L. & Med. (2018); 9-ER-2049–60.

44

- Christina Camilleri & Stephen Sammut, *Progesterone-Mediated Reversal of Mifepristone-Induced Pregnancy Termination in a Rat Model: An Exploratory Investigation,* 13, 10942 Scientific Reports (2023); 9-ER-2066–76.

(emphasis added). Ignoring all of these studies, the lower court pointed to a single study that uses the phrase "abortion pill rescue." Since that *one* study used the term "rescue" rather than "reversal," the court viewed reversal as misleading. 1-ER-014. Yet the word "reversal" accurately describes the vast majority of the scientific literature. *See ONY*, 720 F.3d at 499.

Second, it also accurately describes, both scientifically and in everyday language, the impact progesterone has on the intended effects of the first abortion pill, mifepristone. Mifepristone competes with progesterone for receptors; when it binds to a receptor, it blocks progesterone, cutting off necessary nutrients to the unborn child. 7-ER-1443. Progesterone "reverses" this through a process scientifically known as "*reversible* competitive inhibition." 7-ER-1442 (emphasis added). Supplemental progesterone can outcompete mifepristone, attach to progesterone receptors, and provide the nutrients that mifepristone blocked. *Id.* That's the definition of "reversal." In fact, the FDA calls Narcan—which uses a similar process to reverse drug overdose effects—an "overdose reversal drug." *Id.*, 2-ER-205–06.

45

The same process can occur even when a receptor "antagonist" such as mifepristone binds more tightly to a receptor than an "agonist" like progesterone: "its effects can be overcome through an increase in the concentration of the competing substrate." 7-ER-1442–45. In treating carbon monoxide poisoning with oxygen therapy, for example, oxygen is used to outcompete carbon monoxide, even though carbon monoxide binds more tightly to the oxygen receptors. *Id.*

Of course, using oxygen, or Narcan, does not literally "reverse" the fact that carbon monoxide poisoning took place, or that a drug overdose occurred. But if taken in time, those treatments can reverse the *effects* of carbon monoxide poisoning or a drug overdose and prevent death. That's why doctors use the term "reverse" to describe those treatments.

The same is true here. Progesterone does not "reverse" the reality that a woman took mifepristone; only time travel could do that. But if taken before fetal demise, progesterone can reverse the *effects* of that abortion drug on her pregnancy and her baby's ability to survive.

Women who desire this type of treatment search for terms like "abortion pill reversal." 7-ER-1577 (after regretting taking mifepristone, Atoria Foley searched for "abortion pill reversal," which connected her to a NIFLA member center that prescribed progesterone, leading to a healthy delivery). This is why the Attorney General seeks to censor the use of "reversal," 7-ER-1387 (admitting that it is a likely search term

46

for women seeking to stop an in-progress medication abortion), not because the term is false or misleading. This Court should not sanction the censorship of a life-saving term that many women use to find the very therapy about which the Centers desire to give information.

Finally, the district court found that "[Abortion *Pill* Reversal] is not *abortion* reversal." 1-ER-014 (emphasis added). But no reasonable consumer reading the Centers' statements would understand them to suggest that progesterone can reverse a completed abortion. *Cf. Werbel v. Pepsico, Inc.*, No. C09-04456, 2010 WL 2673860, at *1, **3–5 (N.D. Cal. July 2, 2010) (dismissing claim and concluding that, as a matter of law, no "reasonable consumer" examining the entire packaging would believe that "Cap'n Crunch's Crunch Berries" cereal "derives any nutritional value from berries"); *Videtto v. Kellogg USA*, No. 2:08cv01324, 2009 WL 1439086, at *1, *3 (E.D. Cal. May 21, 2009) (dismissing without leave to amend claims that consumers reasonably believed that "Froot Loops" cereal contained "real, nutritious fruit" because the cereal's packaging could not "reasonably be interpreted to imply that [Froot Loops] contains or is made from actual fruit"). Instead, "women clearly understand that [they] are trying to reverse the effects of a drug that has a goal of ending their babies' lives and if [they] can do so in a timely manner, [they] have [the] best chance of helping them maintain their pregnancy." 2-ER-204–05.

47

### b. Progesterone therapy is safe and effective within the normal meaning of those terms.

Since it was first approved by the FDA in 1978, supplemental progesterone has a long history of safely and effectively supporting pregnancies. 7-ER-1445; 7-ER-1501–06. The Attorney General admits it is a "low-risk medication." 2-ER-238. Along with its long history of safe usage in general pregnancy support, multiple studies have concluded that it is "safe and effective" when used in APR. *Supra* II(B)(1). In contrast, *no* studies show that progesterone is unsafe or ineffective when used according to recommended protocols for APR.

Of course, no drug is 100% safe or effective. To take just one example, the FDA warns women that the abortion drug protocol can result in "serious and sometimes fatal infections or bleeding" and the protocol fails around 7% of the time at ten weeks gestation. 9-ER-1991–96. Rather, medical treatments are considered safe and effective relative to their benefit. 2-ER-199 ("safe and effective" are relative to the "patient's specific needs and other potential options or risks"). Here, the benefit to a patient (increasing the chance of saving her unborn child's life) far outweighs any perceived minimal risk.

*Safe.* The Attorney General's expert acknowledges that progesterone is a "low-risk medication" and that data "indicates that progesterone is safe for use during pregnancy." 2-ER-238. The Centers agree. 7-ER-1445, 7-ER-1501–06. As do the studies on APR. *Supra* II(B)(1).

Grasping at a straw, the Attorney General relies on a 10-person APR study, the Creinin study, to speculate that APR may not be safe. 7-ER-1606. But the two women in the study who needed medical intervention were those in the placebo group who were *not* given progesterone. 7-ER-1459–60, 7-ER-1361. To the extent the statistically insignificant results show anything, they demonstrated the safety and efficacy of APR because 4 of the 5 women who took progesterone (80%) had continued pregnancies and none required medical intervention. *Id*.

The lower court also mistakenly relied on statements from professional organizations that generally oppose the use of APR. 1-ER-14–15. This was error for three reasons.

First, each of the professional organizations' safety concerns are based solely on the small Creinin study listed above. But as just explained, that study does not support the proposition that APR is unsafe or undermine the other safety data.

Second, the court below took sides in a debate between professional organizations. The court credited recommendations by the American College of Obstetricians and Gynecologists ("AGOG"), and similar organizations in the United Kingdom for "expectant management" (doing nothing) over progesterone treatment. But it ignored that other professional organizations such as the American Association of Pro-life Obstetricians and Gynecologists ("APPLOG") and

49

Canadian Physicians for Life have published clinical guidance affirming the safety and efficacy of APR and recommending progesterone therapy over expectant management. 5-ER-821–28. "The current research suggests that using progesterone to counter the effects of mifepristone and stop the abortion process is both safe and effective." *Id.*; *see also* 5-ER-820 (APR progesterone therapy may be provided "safely."). As this Court admonished in *California Chamber of Commerce*, when professional organizations disagree whether a chemical is dangerous, even commercial speech taking one side of the debate is protected. 29 F.4th at 478.

Third, the lower court misread ACOG's position. Its cited quote from ACOG does not assert that progesterone treatment may be unsafe. It merely concludes (based on the Creinin study) that not taking misoprostol after taking mifepristone may be unsafe. 1-ER-015. Neither that study nor any other study of which the Centers are aware suggests that progesterone therapy is unsafe. That mifepristone might result in hemorrhaging cannot justify a finding that progesterone therapy is unsafe. This is because ACOG, the Attorney General, and the other professional organizations that the district court relied on all agree that women who change their mind after taking mifepristone should practice "expectant management" and forego taking misoprostol. 4-ER-733; 7-ER-1377.

50

Moving on from the scientific debate between professional organizations, the lower court erred by dismissing all progesterone-safety data not measured in the specific APR context—and all the data in the APR context as well. 1-ER-015–16. But neither the state's expert nor the court provided any explanation why progesterone would be *less* safe for pregnancy when taken after mifepristone. *Id.* Quite the opposite. The data available to date, with thousands of women having taken progesterone for APR, indicates that progesterone's safety is no different in the APR context. 7-ER-1445–47, 7-ER-1454–63, 2-ER-206.

Ironically, and revealing his viewpoint discrimination, the Attorney General holds himself to a much lower standard for what is "safe." In the first paragraph of the Attorney General's state enforcement action to censor APR information, he claims (parroting Planned Parenthood, 7-ER-1543–51) that abortion drugs (notwithstanding their FDA black box label) are "proven to be incredibly safe," even "safer than … Tylenol." 7-ER-1593. Yet the FDA-approved label for mifepristone warns that when using the abortion drugs as approved, roughly one in twenty-five women will go to the emergency department with complications that may include retained tissue, infections requiring antibiotics, or bleeding so heavy it requires blood transfusions or emergency surgical procedures. 10-ER-2193–97, 7-ER-1439–40. A more recent study shows that those serious adverse

51

events occur in one in ten patients.[10] The Attorney General's expert does not even attempt to defend the claim that abortion drugs are safer than Tylenol. 4-ER-733. And despite knowing that Planned Parenthood uses this false statement to sell abortion drugs, the Attorney General has not retracted his own false statements or enforced the FAL or UCL against Planned Parenthood. 7-ER-1543–52.

*Effectiveness.* The Centers wish to inform the public of the results of published scientific studies showing that APR is effective. Every study conducted to date in both humans and animals has shown a likely increase in survival rates for babies of women who take progesterone after taking mifepristone. 2-ER-201, 9-ER-2078. There are over 1,391 documented successful cases of APR,[11] and estimates suggest it has saved over 6,000 babies lives.[12]

---

[10] Data from an all-payer insurance claims database that includes 865,727 prescribed mifepristone abortions from 2017 to 2023 shows that more than one in ten patients experienced a serious adverse event, as defined by the Food and Drug Administration. Jamie Bryan Hall & Ryan T. Anderson, *The Abortion Pill Harms Women: Insurance Data Reveals One in Ten Patients Experiences a Serious Adverse Event*, Ethics & Pub. Pol'y Ctr. (Apr. 28. 2025), https://eppc.org/publication/stop-harming-women/.

[11] Decl. of Heartbeat Int'l President Jor-El Godsey ¶ 14, *People of State of Cal. v. Heartbeat Int'l, Inc.*, No. 23CV044940 (Feb. 5, 2024), https://cdn.prod.website-files.com/63d954d4e4ad424df7819d46/65c2901 cc7d2889ab97cc034_3.%20Declaration%20of%20Jor-El%20Godsey.pdf.

[12] Impact Report, *supra* note 3.

For example, a 2023 literature review of relevant data at the time (16 studies), found that the "continuing pregnancy rate after ingesting mifepristone alone is ≤25 percent for gestational age ≦49 days." 9-ER-2085. On the other hand, the "continuing pregnancy rate after ingesting mifepristone, followed by progesterone, is 65 percent and 69 percent using the delivery regimens intramuscular injection and high-dose oral, respectively." *Id.* The data also indicated "no increased maternal or fetal risk." *Id.* Thus, the study concluded "mifepristone antagonization with progesterone is a safe and effective treatment," *id.*—roughly two to three times more effective than not taking progesterone. 9-ER-2086.

Neither the Attorney General nor the court below cites one study to the contrary. Instead, the lower court relied once again on one side of the scientific debate and ignored the professional organizations' opinions on the other. 1-ER-016 (calling ACOG's opinion the "weight of authority" while ignoring AAPLOG's guidance supporting APR). And it deemed *all* the studies supporting APR to be "unreliable" or to lack "credibility" in some way. 1-ER-16–20. This is error.

First, it flips the burden. While the data, and the living, breathing children who are with us today, show that APR effectively saves lives, the Attorney General may censor speech only if he shows that the Centers' progesterone-therapy advocacy is false or misleading. He has not, and cannot, do so. *Cf. Peel v. Att'y Registration & Disciplinary*

53

*Comm'n of Ill.*, 496 U.S. 91, 109 (1990) (state lacked "empirical evidence" to support its "heavy burden" to prove advertisements were misleading or likely to mislead).

Second, it is error because it is not the role of the court or the Attorney General to second-guess the reliability of peer-reviewed studies and censor the Centers from expressing the conclusions of the studies absent clear contradictory evidence. *Supra* II(B)(1).

Third, the studies cited, taken together, constitute reliable data that may form the basis for a clinical recommendation to offer APR as an option to women with fully informed consent. 7-ER-1453–64 (collecting and analyzing data); 5-ER-821–28 (clinical recommendations to use progesterone treatment); 5-ER-820 (same). If the data is enough for that, it is enough for the Centers to express to the public their opinion that this is an option women may speak to their doctors about and make an informed decision for themselves.

Fourth, the district court's individual critiques of the studies are misplaced. The court discounted three of the human studies cited in support of APR merely because they are retrospective "case studies" (not double-blind controlled studies) as if that somehow makes them unreliable. 1-ER-17–18. But clinical recommendations, including FDA approvals of safety and effectiveness, are often based on noncontrolled studies. 2-ER-200–01, 7-ER-1453, 7-ER-1437. This is especially true in

54

the context of pregnancy where the use of human subjects or control groups would often be unethical. For example, ACOG makes two-thirds of its clinical recommendations based on "limited and inconsistent scientific evidence," or "consensus and expert opinion." 7-ER-1453. In fact, mifepristone itself was approved by the FDA based on two noncontrolled studies. 2-ER-200–01. The court below erred by applying an egregiously high standard for "reliability" that does not fit medical reality. *Id.*

The court also offers additional mistaken critiques of the 547-person case study that demonstrated a 64–68% continuing pregnancy rate with oral or injection progesterone treatment, compared to a base rate of 25% without progesterone treatment. 9-ER-2050. The court claims that this study is unreliable because it excluded women who did not meet the inclusion criteria for the protocol (i.e., patients whose unborn child was already demised or who had already taken the second abortion pill). 1-ER-018. But these are design strengths, not flaws. It would not make sense to administer progesterone to women who had confirmed fetal demise from mifepristone, or who had taken misoprostol (which progesterone is not designed to compete with).

The court further critiques this study for using different providers across the country, *id.*, but does not explain how that makes it inherently unreliable or its conclusions not credible.

55

Lastly, the court mistakenly alleges that the study cannot be "scientific" because it is "not published in a peer-reviewed journal directed towards providers." *Id.* Not so. "Issues in Law & Medicine is a peer-reviewed medical and legal professional journal" listed on PubMed and other databases[13] that has been relied on by Supreme Court justices for medical issues related to abortion. *See e.g., Stenberg v. Carhart*, 530 U.S. 914, 994 (2000) (Thomas, J. dissenting).

In any event, the Centers are entitled to a preliminary injunction because the Attorney General offers no counter studies disproving the safety or efficacy of progesterone therapy. At most, his attacks demonstrate "evidentiary equipoise," which is insufficient to justify a content-based restriction of speech. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006).

## C. The Attorney General cannot justify censoring progesterone-therapy advocacy under strict or intermediate scrutiny.

"In the ordinary case, it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S.at 571. "The First Amendment requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys." *Id.* at 566 (internal

---

[13] Issues in Law & Medicine, *About*, https://issuesinlawand medicine.com/about/ (last accessed Apr. 30, 2025).

quotation marks omitted). To survive strict scrutiny, the Attorney General must show that enforcing the UCL and FAL against NIFLA and the Centers is the least restrictive method to serve a compelling state interest. *Hoye v. City of Oakland*, 653 F.3d 835, 853 (9th Cir. 2011).

Even were First Choice's speech deemed commercial, the Attorney General would have to satisfy intermediate scrutiny by showing his enforcement advances a "substantial" state interest, "the harms [he] recites are real," and the restriction "will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 767, 770–71 (1993). His actions must also be "narrowly drawn," that is, "not more extensive than … necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 565–66. The Attorney General can meet neither standard here.

In fact, the Attorney General, never even argued that his speech restriction satisfies any standard of review. *See* 7-ER-1367–94. He thus waived that argument and the district court erred by creating an interest sua sponte for the state. 1-ER-020. "[T]he government has the burden of showing that there is evidence supporting its proffered justification." *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 859 (9th Cir. 2004). "If the government fails to make that showing, it cannot prevail. The district court cannot supply a justification that the government fails to provide." *Cornelio v. Connecticut*, 32 F.4th 160, 177–78 (2d Cir. 2022).

57

### III. The remaining preliminary injunction factors favor issuing the injunction.

In First Amendment cases like this one, the Centers' likelihood of success on even one of their claims is "determinative" and the Court may "confine [its] analysis to that factor." *Mobilize the Message*, 50 F.4th at 934 (citation omitted). As shown above, the Center is likely to prevail on its First Amendment claim. The remaining preliminary injunction factors—irreparable harm, balance of equities, and public interest—also all favor an injunction.

#### A. The Centers will suffer irreparable harm without an injunction.

Irreparable harm is "relatively easy to establish in a First Amendment case" because the plaintiff "need only demonstrate the existence of a colorable First Amendment claim." *Cal. Chamber of Com.*, 29 F.4th at 482 (citations omitted). This is because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (citation omitted). Because the Centers are likely to succeed on their First Amendment claim, they have shown that they will suffer irreparable harm without an injunction.

### B.    The public interest and balance of equities strongly favor an injunction.

When a government entity is the party opposing injunctive relief, "the third and fourth factors—the balance of equities and the public interest—'merge.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Because "it is always in the public interest to prevent the violation of a party's constitutional rights," these factors also favor an injunction. *Am. Beverage Ass'n v. City and Cnty. of S.F.*, 916 F.3d 749, 758 (2019) (citation omitted),

Although that resolves the last two factors, the balance of the equities firmly favors the Centers for an additional reason in this case. Chilled speech is particularly harmful in the medical context, where the Attorney General's "paternalistic[]" suppression of information "interferes with the ability of physicians and patients to receive potentially relevant treatment information." *Caronia*, 703 F.3d at 166. This censorship can "inhibit, to the public's detriment, informed and intelligent treatment decisions." *Id*; *see also Planned Parenthood Az., Inc. v. Humble*, 753 F.3d 905, 916 (9th Cir. 2014). The Attorney General cannot rely on his asserted interest in women's health because there is "no reasonable fit" between that interest and his regulation of speech based only on his own view of the truth. *It. Colors Rest. v. Becerra*, 878 F.3d 1165, 1178 (9th Cir. 2018).

\*     \*     \*

As the Supreme Court reiterated in vindicating pregnancy centers'
First Amendment rights in *NIFLA*, "the best test of truth is the power
of the thought to get itself accepted in the competition of the market."
585 U.S. at 772 (quotation omitted). Here, the Attorney General is
censoring pro-life organizations from speaking about a safe and
potentially life-saving medical treatment because he disagrees with
their point of view. But "the people lose when the government is the one
deciding which ideas should prevail." *Id.*

## CONCLUSION

This court should reverse.

Respectfully submitted,

Dated: May 7, 2025

By: */s/ J. Caleb Dalton*

| | |
|---|---|
| John J. Bursch | J. Caleb Dalton |
| jbursch@adflegal.org | cdalton@adflegal.org |
| Erin Hawley | Erik Baptist |
| ehawley@adflegal.org | ebaptist@adflegal.org |
| Lincoln Wilson | Allison H. Pope |
| lwilson@adflegal.org | apope@adflegal.org |
| Caroline C. Lindsay | ALLIANCE DEFENDING FREEDOM |
| clindsay@adflegal.org | 44180 Riverside Pkwy |
| ALLIANCE DEFENDING FREEDOM | Lansdowne, Virginia 20176 |
| 440 First Street NW | T: (571) 707-4655 |
| Suite 600 | |
| Washington, DC 20001 | |
| T: (202) 393-8690 | |

*Counsel for Appellants*

60

## STATEMENT OF RELATED CASES

Plaintiffs-Appellants are unaware of any related cases currently pending in this Court.

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2025, I electronically filed the foregoing Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ J. Caleb Dalton*
J. Caleb Dalton
*Counsel for Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**    25-2287

I am the attorney or self-represented party.

**This brief contains**  12,215  **words,** including  0  words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  /s/ J. Caleb Dalton    **Date**  May 7, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*