No. 25-2287

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, on behalf of itself and its members; and SCV PREGNANCY CENTER,

Plaintiffs-Appellants,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California,

Defendant-Appellee.

_____

**On Appeal from the United States District Court
for the Central District of California
No. 2:24-cv-08468-HDV-MARx**

_____

## APPELLEE'S ANSWERING BRIEF

_____

ROB BONTA
  *Attorney General of California*
NELI N. PALMA
  *Senior Assistant Attorney General*
KARLI EISENBERG
KATHLEEN BOERGERS
  *Supervising Deputy Attorneys
  General*
ERICA CONNOLLY
HAYLEY PENAN
LAUREN ZWEIER
  *Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7755
Fax: (916) 327-2319
Erica.Connolly@doj.ca.gov
  *Attorneys for Defendant-Appellee
  Attorney General Rob Bonta*

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................... 1

Issues Presented for Review ............................................... 2

Statement of the Case .......................................................... 2

    I.    Overview of "Abortion Pill Reversal" ...................... 2

        A.    Mechanism of Mifepristone in Medication Abortion ..... 3

        B.    Development of APR ....................................... 6

        C.    Several Leading Medical Organizations Have Concluded that No Evidence Supports APR ............... 16

        D.    Three Federal District Courts Have Concluded that Representations about APR's Safety and Efficacy Are Misleading ................................................. 17

    II.    The Attorney General's State Enforcement Action ................ 18

    III.    NIFLA and SCV ................................................... 20

        A.    The CPCs' APR Advertisements ................................. 20

        B.    The CPCs' Financial Earnings ..................................... 22

    IV.    Proceedings Below ............................................... 23

Summary of Argument ......................................................... 26

Standard of Review .............................................................. 28

Argument ............................................................................ 29

    I.    The District Court Correctly Held that the CPCs Are Unlikely to Prevail on the Merits .......................................... 29

        A.    The District Court Correctly Held that the CPCs' APR Advertisements Qualify as Commercial Speech .. 30

        B.    The District Court Correctly Found that the CPCs' APR Advertisements Are Likely False and Misleading and Not Protected by the First Amendment ................................................. 41

i

# TABLE OF CONTENTS
## (continued)

**Page**

    C.    The District Court Correctly Held that the CPCs Have Not Shown that the Attorney General Engaged in Viewpoint Discrimination.......................................... 59

II.    The CPCs Have Not Suffered Irreparable Harm Sufficient to Justify Interim Relief........................................... 62

III.    The Balance of Equities and the Public Interest Factors Support the District Court's Denial of the Preliminary Injunction................................................................ 63

Conclusion ................................................................... 64

# TABLE OF AUTHORITIES

**Page**

CASES

*All-Options, Inc. v. Att'y Gen. of Ind.*
  546 F. Supp. 3d 754 (S.D. Ind. 2021) ...................................................... 17, 48

*Am. Acad. of Pain Mgmt. v. Joseph*
  353 F.3d 1099 (9th Cir. 2004) ..........................................................32, 56, 57

*Am. Beverage Ass'n v. City & Cnty. of S.F.*
  916 F.3d 749 (9th Cir. 2019) ................................................................28, 29

*Am. Med. Ass'n v. Stenehjem*
  412 F. Supp. 3d 1134 (D.N.D. 2019)........................................................ 18, 52

*Ariix, LLC v. NutriSearch Corp.*
  985 F.3d 1107 (9th Cir. 2021) ...............................................30, 31, 35, 36, 37

*Baccei v. United States*
  632 F.3d 1140 (9th Cir. 2011) .....................................................................53

*Bellion Spirits, LLC v. United States*
  7 F.4th 1201 (D.C. Cir. 2021)................................................................42, 43

*Bernardo v. Planned Parenthood Fed'n of America*
  115 Cal. App. 4th 322 (2004) ...........................................................39, 55, 56

*Bolger v. Youngs Drug Prods. Corp.*
  463 U.S. 60 (1983).................................................................................*passim*

*Cadena v. Customer Connexx LLC*
  107 F.4th 902 (9th Cir. 2024) .......................................................................56

*California v. ARC Am. Corp.*
  493 U.S. 93 (1989).......................................................................................19

*Cal. Chamber of Comm. v. Council for Educ. & Rsch. on Toxics*
  29 F.4th 468 (9th Cir. 2022) ............................................................28, 29, 52

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*Cent. Hudson Gas & Elec. v. Public Svc. Comm'n*
    447 U.S. 557 (1980) ..................................................................40, 41, 42, 56

*Conformis, Inc. v. Aetna, Inc.*
    58 F.4th 517 (1st Cir. 2023) ...........................................................54

*Cornelio v. Connecticut*
    32 F.4th 160 (2d Cir. 2022) .............................................................58

*DISH Network, Corp. v. FCC*
    653 F.3d 771 (9th Cir. 2011). .........................................................62

*Eastman Chem. Co. v. Plastipure, Inc.*
    775 F.3d 230 (5th Cir. 2014). .....................................................54, 55

*ECM BioFilms, Inc. v. FTC*
    851 F.3d 599 (6th Cir. 2017) ...........................................................43

*First Resort, Inc. v. Herrera*
    860 F.3d 1263 (9th Cir. 2017) ......................................................*passim*

*Garcia v. Google, Inc.*
    786 F.3d 733 (9th Cir. 2015) ...........................................................63

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Baltimore*
    879 F.3d 101 (4th Cir. 2018) ...........................................................38

*Hoye v. City of Oakland*
    653 F.3d 835 (9th Cir. 2011) .......................................................59, 60

*Kuba v. 1-A Agric. Ass'n*
    387 F.3d 850 (9th Cir. 2004) ...........................................................58

*Lydo Enter., Inc. v. City of Las Vegas*
    745 F.2d 1211 (9th Cir. 1984) .....................................................62, 63

*Maryland v. King*
    567 U.S. 1301 (2012) ......................................................................63

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Meinecke v. City of Seattle*
  99 F.4th 514 (9th Cir. 2024) ................................................................29

*ONY, Inc. v. Cornerstone Therapeutics, Inc*
  720 F.3d 490 (2d Cir. 2013).........................................52, 53, 54, 56

*Pearson v. Shalala*
  164 F.3d 650 (D.C. Cir. 1990) .....................................................57, 64

*Peel v. Atty Registration & Disciplinary Comm'n of Ill.*
  496 U.S. 91 (1990) ..............................................................................42

*Pimental v. Dreyfus*
  670 F.3d 1096 (9th Cir. 2012) ...........................................................28

*Planned Parenthood of Tenn. & N. Miss. v. Slatery*
  523 F. Supp. 3d 985 (M.D. Tenn. 2021).............................17, 45, 50

*Pleasant Grove City v. Summum*
  555 U.S. 460 (2009)............................................................................61

*POM Wonderful, LLC v. FTC*
  777 F.3d 478 (D.C. Cir. 2015) ..........................................................43

*Reed v. Town of Gilbert*
  576 U.S. 155 (2015)............................................................................61

*Resort Car Rental Sys., Inc. v. FTC*
  518 F.2d 962 (9th Cir. 1975) .............................................................51

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*
  487 U.S. 794-95 (1988) .................................................................36, 37

*Rosenberger v. Rector & Visitors of Univ. of Va.*
  515 U.S. 819 (1995)............................................................................62

*Sears, Roebuck & Co. v. FTC*
  676 F.2d 385 (9th Cir. 1982) .......................................................40, 43

## TABLE OF AUTHORITIES
### (continued)

Page

*Smith v. Helzer*
  95 F.4th 1207 (9th Cir. 2024) ....................................................29

*Sorrell v. IMS Health Inc.*
  564 U.S. 552 (2011) ...........................................................61, 62

*Susan B. Anthony List v. Driehaus*
  573 U.S. 149 (2014) ................................................................30

*Tingley v. Ferguson*
  47 F.4th 1055 (9th Cir. 2022) ...............................................41

*Turner Broadcasting Sys., Inc. v. FCC*
  512 U.S. 622 (1994) ................................................................62

*United States v. Caronia*
  703 F.3d 149 (2d Cir. 2012)...................................................62

*United States v. Elias*
  921 F.2d 870 (9th Cir. 1990) ..................................................4

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*
  425 U.S. 748 (1976) ................................................................40

*Veera v. Banana Republic, LLC*
  6 Cal. App. 5th 907 (2016) ...................................................51

*Waln v. Dysart Sch. Dist.*
  54 F.4th 1152 (9th Cir. 2022) ...............................................59

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008)....................................................................28

*Yelp Inc. v. Paxton*
  --- F.4th ---, 2025 WL 1404272 (9th Cir. 2025)................59, 60, 61

*Yim v. City of Seattle*
  63 F.4th 783, 800 (9th Cir. 2023) ........................................38

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

S<small>TATUTES</small>

15 U.S.C. § 1127 ......................................................................33

42 U.S.C. § 1983 ......................................................................24

Cal. Bus. & Profs. Code
    § 17200, *et seq.* ...........................................................*passim*
    § 17500, *et seq.* ...........................................................*passim*

# INTRODUCTION

In September 2023, Defendant-Appellee Attorney General Rob Bonta ("Attorney General") brought a state court civil enforcement action against Heartbeat International, Inc. ("HBI") and RealOptions Inc. ("RO") to protect California residents from false and misleading advertising for a purported "medical treatment" called "Abortion Pill Reversal" or "APR" ("Enforcement Action"). This action, scheduled for trial in November 2025, is narrowly tailored to address eight statements in advertisements for APR that the Attorney General has identified as false and misleading—not speech about APR writ large. The Attorney General's purpose is to ensure that pregnant individuals in time-sensitive situations receive accurate medical information so they can make well-informed decisions.

More than a year after the Enforcement Action was filed, Plaintiffs-Appellants National Institute for Family and Life Advocates ("NIFLA"), on behalf of itself and its members, and SCV Pregnancy Center ("SCV") (collectively, "Crisis Pregnancy Centers" or "CPCs") sued the Attorney General, claiming the Enforcement Action violated the CPCs' free speech, free exercise, and due process rights. The CPCs are not defendants in the Enforcement Action, but they similarly want to advertise APR as a "safe" and "effective" medical treatment that

1

"reverses" the "abortion pill," despite no scientific evidence showing that APR is safe, effective, or "reverses" anything.

Notwithstanding their year-plus delay in filing suit, the CPCs moved for a preliminary injunction seeking to block the Attorney General from enforcing California's consumer protection laws against the CPCs for any advertisement for APR that included the phrases "safe," "effective," or "reverse." The district court properly denied the CPCs' request on grounds that their APR advertisements enjoy no First Amendment protection. The district court held that their APR advertisements qualify as commercial speech and—consistent with every other district court to have examined the factual basis for the claims—feature inherently misleading statements. This Court should affirm.

## ISSUES PRESENTED FOR REVIEW

Whether the district court properly denied a preliminary injunction request where the CPCs advertise APR to the public by claiming APR "reverses" the "abortion pill" and that APR is "effective" and "safe," despite no scientific evidence showing that APR "reverses" the "abortion pill" or that APR is "effective" and "safe."

## STATEMENT OF THE CASE

## I.    OVERVIEW OF "ABORTION PILL REVERSAL"

At the core of both the Enforcement Action and the CPCs' preliminary injunction request are advertisements claiming that APR is a "safe" and "effective"

2

method to "reverse" the first drug in the two-drug medication abortion regimen.  7-ER-1516–17, 1617–18.  The scientific evidence regarding medication abortion and APR does not support those statements.

### A.    Mechanism of Mifepristone in Medication Abortion

Background regarding medication abortion and mifepristone is essential to understanding APR.  Since 2016, the FDA-approved medication abortion regimen has consisted of two drugs:  the oral administration of 200mg of mifepristone, followed by 800mcg of misoprostol administered buccally (i.e., dissolved in the cheek) 24 to 48 hours later.  2-ER-216–17.  FDA has approved individuals using medication abortion until 70 days' gestation.  2-ER-216.

Mifepristone acts by blocking the progesterone receptors in a pregnant individual's uterus and cervix, as well as by increasing the sensitivity of the uterus and cervix to prostaglandins, which are hormones that induce contractions in the uterus.  2-ER-222–23.  Progesterone is essential for pregnancy because it ensures that the uterus maintains its lining and does not contract, which would result in expulsion of pregnancy tissue.  2-ER-223.  During pregnancy, the body floods itself with progesterone, with the levels of the hormone remaining high throughout pregnancy.  *Id.*

Mifepristone, however, binds tightly to progesterone receptors in the uterus and cervix, with those receptors preferring mifepristone over progesterone.  2-ER-

222.  The body absorbs mifepristone quickly, within one to two hours after oral administration.  2-ER-223.  By binding with the progesterone receptors, mifepristone blocks progesterone from connecting with those receptors and from affecting the uterus and cervix.  *Id.*  As a result, the body's extra progesterone is ineffective:  the uterine lining breaks down and begins to separate from the uterine wall, and the body begins producing prostaglandins that contribute to uterine contractions.  *Id.*  The second drug, misoprostol, which is a prostaglandin analogue, triggers uterine contractions that lead to the expulsion of pregnancy tissue.  2-ER-223.

Misoprostol is effective on its own for terminating pregnancies, but higher doses are necessary, resulting in greater risk of side effects.  2-ER-218.  Mifepristone, through its progesterone-blocking and prostaglandin-sensitizing action, increases the effectiveness of misoprostol.  *Id.*  Using the two drugs together thus results in a regimen with a lower dose of misoprostol, higher overall efficacy, and fewer side effects.  *Id.*  Decades of peer-reviewed research following tens of thousands of individuals have shown that this two-drug regimen for medication abortion is exceedingly safe as well as effective.[1]  2-ER-219–20; 3-ER-

---

[1] The CPCs rely on an April 28, 2025 article about so-called "adverse events" from medication abortion.  Op. Br. 52 n.10.  This article was "not presented to the district court" and therefore is "not part of the record on appeal."  *United States v. Elias*, 921 F.2d 870, 874 (9th Cir. 1990).  Regardless, the CPCs'

(continued…)

4

527; 4-ER-681.  Medication abortion's effectiveness wanes, however, further along in pregnancy.  2-ER-219.

Although the two-drug regimen is highly effective for pregnancy termination, mifepristone's effectiveness alone is unknown, particularly at the current regimen. 2-ER-224.  According to one 2015 review of studies in which subjects received only mifepristone, the rate of "continuing pregnancy proportions ranged from 8% to 46% with the different regimens."  4-ER-703.  A 2017 literature review by an APR proponent concluded that "[t]aking all studies into consideration, with daily doses of 50-600 mg and total doses of 200-1000 mg, the percentage of [continued pregnancies] varied from 0-50%."  9-ER-1984.  Because "available and limited data suggests a very wide range" of potential outcomes, it is impossible to "infer a rate of continuing pregnancy following mifepristone alone."  2-ER-224.  In sum, although mifepristone is very effective at blocking progesterone, its effectiveness at terminating pregnancies is unknown.

---

reliance is misplaced:  the article, which is not peer-reviewed, has numerous flaws. Even the CEO of the American Association of Pro-Life OBGYNs has stated that the article "is not a study in the traditional sense" and is "not conclusive proof of anything."  *See* Alicia Miranda Ollstein, *"Rolling Thunder": Inside Conservatives' Strategy to Curb Abortion Pill Access*, Politico (May 7, 2025), https://www.politico.com/news/2025/05/07/anti-abortion-pill-gameplan-rolling-thunder-00331933.

**B.    Development of APR**

**1.    The APR Protocol**

The APR protocol involves the administration of high dose supplemental progesterone to individuals who have taken mifepristone—the first drug in the medication abortion regimen—but have not taken the second drug, misoprostol.  5-ER-770.  The goal is for the patient to take supplemental progesterone within 72 hours of taking mifepristone.  *Id.*

Patients undergoing APR have an initial in-person visit, which often includes an ultrasound to confirm pregnancy viability.  5-ER-774.  Patients then receive prescriptions for progesterone or are immediately administered progesterone, with "continuing care" of repeated progesterone administration for at least two weeks and ultrasounds every one to two weeks for at least twelve weeks.  5-ER-774–75.  For patients that receive progesterone injections, they must return to the provider for every injection.  *Id.*

"Costs of the treatment vary depending on the progesterone used," although "[i]nsurance plans may cover treatment."  5-ER-780.  Patients "who do not have insurance or financial means to pay for treatment" can "discuss this with the medical provider," resulting potentially in payment help in "cases of financial hardship."  *Id.*

6

### 2.    Theory Underlying APR

The CPCs claim that mifepristone blocks progesterone through "reversible competitive inhibition."  Op. Br. 9; 7-ER-1442.  They claim that by increasing the amount of progesterone in the body, additional progesterone will "outcompete" the mifepristone, thereby ensuring the continuation of the pregnancy.  7-ER-1443–44, 1511.  According to the CPCs, APR thereby "reverses" the effects of mifepristone through the administration of supplemental progesterone within 72 hours after taking mifepristone.  7-ER-1516.

This theory does not account for the fact that progesterone receptors prefer— and bind more tightly to—mifepristone than to progesterone, thereby blocking the progesterone from affecting the uterus and cervix.  2-ER-223.  Nor does this theory account for mifepristone's rapid absorption into the body, with its connection to progesterone receptors—and the resulting block of progesterone—occurring just one to two hours after ingestion.  *Id.*

### 3.    Primary APR Studies

Nevertheless, relying on this theory, Dr. George Delgado, an anti-abortion physician with board certifications in family medicine and hospice and palliative care, sought to establish that APR was effective for pregnancy continuation after taking mifepristone.  4-ER-708–09.

*2012 Case Series*:  First, along with Dr. Mary Davenport, Delgado authored a 2012 case series in *Annals of Pharmacotherapy* following six women who had taken mifepristone but wanted to continue their pregnancies ("2012 Case Series"). 9-ER-2063–64.  Of the six subjects, four had continuing pregnancies resulting in live births; one subject had a completed abortion; and the sixth subject was lost to follow up.  Delgado did not record the mifepristone dosage for each subject, so it is not clear whether the subjects received the same or different dosages or how that might have affected the outcomes.  *Id.*  Each subject was administered supplemental progesterone, but the dosage, the method of administration, the gestational age, and the time between taking mifepristone and progesterone all differed, which further muddied any link between supplemental progesterone and continuing pregnancy.  *Id.*  These different variables make it impossible to determine whether the supplemental progesterone *caused* the four subjects' pregnancies to continue—especially as mifepristone's ability to terminate a pregnancy on its own is unclear.  2-ER-224.

After the 2012 Case Series, Delgado proposed a treatment protocol, 9-ER-2064, and created a website and hotline for patients seeking to continue their pregnancies after taking mifepristone, 9-ER-2053, 4-ER-708.

*2017 Literature Review*:  In 2017, Davenport claimed to have conducted a "systematic review of the literature" to establish a baseline of the percentage of

8

pregnancies that will continue after mifepristone is administered alone ("2017 Literature Review"). 9-ER-1975–90. Knowledge of the percentage of pregnancies that will continue after taking mifepristone alone is crucial for determining whether APR is effective. 2-ER-224. If, for example, taking only mifepristone results in ongoing pregnancies 50% of the time, APR must result in ongoing pregnancies more than 50% of the time to even potentially be effective. *Id.*

According to the 2017 Literature Review, Davenport started with a collection of studies that "were pertinent to efficacy of mifepristone as an abortifacient." 9-ER-1980. She then filtered out studies that did not use ultrasound to distinguish between "continuing pregnancies" and "incomplete uterine evacuations" (i.e., pregnancy tissue remaining in the uterus but with no viable pregnancy). 9-ER-1981. Twelve studies qualified under her criteria. 9-ER-1984.

Despite those studies having mifepristone dosages ranging from 200mg to 1000mg and pregnancy continuation rates ranging from 0% to 50%, 9-ER-1984, Davenport concluded that mifepristone "produces…continuing pregnancy rates of <25% with doses of 200-600 mg at early gestations ≤49 days," 9-ER-1989. She further concluded that although "there is less data at later gestations," "the majority of available studies using mifepristone doses of 400-800 mg and gestational age limits up to 70 days show continuing pregnancy rates of <25%." *Id.*

9

*2018 Report*:  Armed with Davenport's conclusion that only 25% of pregnancies continue after mifepristone alone, Delgado used calls to the hotline he set up after the 2012 Case Series as data for a second article about APR, published in 2018 in *Issues in Law & Medicine* ("2018 Report").[2]  9-ER-2053.

As with the earlier 2012 Case Series, the 2018 Report did not show that APR actually caused pregnancies to continue.  For example, according the 2018 Report, there were 1,668 calls to Delgado's hotline with 754 individuals (i.e., 45%) actually starting APR.  9-ER-2054.  Delgado admitted that medical providers may have used ultrasound to screen some (possibly all) of the 1,668 individuals for viable pregnancies, potentially resulting in only individuals with confirmed viable pregnancies starting APR.  9-ER-2058.  He acknowledged this practice as a "confounding variable":  "It is possible that those embryos who were alive at the time of sonogram may have survived without progesterone therapy."  *Id.*  In other words, the sample of individuals in the 2018 Report was likely biased towards individuals with pregnancies likely to continue even without APR.

Contrary to the normal practice of tracking outcomes for all participants, Delgado excluded another 207 individuals from the study: 1) 38 participants who

---

[2] Delgado had to retract the original version of his article because the institutional review board ("IRB") that he claimed had reviewed and approved the study in fact had not done so.  2-ER-231–32; 4-ER-662–66.  The corrected version of the article states that the study had an IRB waiver.  *Id.*

received progesterone more than 72 hours after they took mifepristone or who had taken misoprostol before receiving progesterone; 2) 112 participants with whom the researchers lost contact before 20 weeks' gestation; and 3) 57 participants who chose to complete their abortion. *Id.* The exclusion of the "lost contact" participants potentially further skewed the results because pregnancy loss could have been the reason for some (possibly all) of the 112 individuals in the "lost contact" group. The 2018 Report does not account for that possibility, instead just eliminating those participants from the results. *Id.*

The 547 individuals included in the study were treated by 325 different medical providers and took progesterone in a variety of ways: high dose oral capsules (31 individuals); intramuscular injections (125 individuals); oral capsules (119 individuals); oral capsules administered vaginally (156 individuals); and vaginal suppositories (34 individuals). 9-ER-2056. The 2018 Report does not address how this variability may have affected its results. Indeed, there is little detail about the dosage of progesterone that each individual took, with only the dosage for the 31 individuals who received the "high dose oral" treatment described in the 2018 Report. *Id.* And there is no correlation between the "reversal rates" of particular treatments and the gestational age of the individuals who underwent that treatment, which matters because medication abortion's effectiveness for terminating a pregnancy decreases as the pregnancy progresses.

11

*Id.* There is no information about health outcomes for the individuals who took the supplemental progesterone and no information at all about the 50% of individuals whose pregnancies did not continue. 9-ER-2050–60. Nevertheless, the 2018 Report claimed an "overall rate of reversal" of 48% and that APR "appears to be both safe and effective," 9-ER-2058, and Delgado established a treatment protocol consisting of high doses of supplemental progesterone via oral capsules, vaginal suppositories, or intramuscular injections for at least two weeks, 5-ER-774–75.

*2019 Creinin Study*: Dr. Mitchell Creinin, a board certified obstetrician/gynecologist and a professor at the University of California, Davis Medical School, sought to test the APR theory using the rigorous standards necessary to establish (or refute) that a medical treatment causes a particular outcome. 2-ER-213, 236; 7-ER-1359–66. Creinin attempted to conduct a randomized controlled study where forty pregnant subjects who wanted abortions agreed to take mifepristone followed by either a placebo or supplemental progesterone to see whether their pregnancies continued before planned surgical abortions. 7-ER-1360–61.

After enrolling twelve subjects, Creinin stopped the study when three subjects had "severe bleeding requiring ambulance transport to an emergency department." 7-ER-1361; 2-ER-236–37. One of those subjects took progesterone 24 hours after mifepristone, and a day later, had "brisk bleeding" and a completed abortion. 7-

12

ER-1361; 2-ER-236–37.  The other two subjects took placebos following mifepristone, and both needed surgical intervention to complete their abortions.  7-ER-1361; 2-ER-236–37.  One of these subjects required a blood transfusion.  7-ER-1361; 2-ER-236–37.  Overall, four of the five subjects in the progesterone group and two of the five subjects in the placebo group had "gestational cardiac activity" two weeks after taking mifepristone.  7-ER-1361; 2-ER-236–37.

Because the study included only twelve subjects—rather than the planned 40 subjects—Creinin could not reach a conclusion about the effectiveness of APR.  7-ER-1363.  He did caution, however, that "[p]atients who use mifepristone for a medical abortion should be advised that not using misoprostol could result in severe hemorrhage, even with progesterone treatment."  *Id.*

These four studies—despite their limitations and flaws—are the crux of the CPCs' claims that their APR advertisements are not false and misleading.  7-ER-1409–14, 1456–58, 1512–14.

### 4.  Additional Studies

The CPCs' and their expert also pointed to (1) animal studies, (2) small case series, and (3) studies in contexts other than APR to bolster their claims.[3]  Op. Br.

---

[3] The CPCs point to a 2023 "literature review" of studies regarding APR, Op. Br. 12, which looked at the same studies that the CPCs otherwise cite, 9-ER-2084.  The flaws of the underlying studies necessarily flow to the literature review's conclusions as well.

13

10-12; 2-ER-1409–11, 1454–60, 1501–06, 1511–14.  Those studies likewise do not show that APR is safe or effective or that it reverses mifepristone.

Animal studies, for example, can provide support for hypotheses about how medical treatments may affect humans.  2-ER-234; 9-ER-2047.  But "results obtained in animal trials do not always accurately reflect outcomes in humans."  9-ER-2047; *see also* 2-ER-234.  Case series, in turn, follow a small group of patients who receive a particular treatment.  2-ER-221; 7-ER-1449.  They are a weak form of evidence to show whether a treatment caused an observed outcome because they are not randomized, have no controls or comparison groups, and do not have structures in place to avoid bias.  2-ER-221.  Their purpose is to provide some support whether further research under more rigorous standards is warranted.  *Id.*

The CPCs and their expert cited two rat studies and two case series to bolster their claims about APR.  7-ER-1455–57.  The first rat study involved simultaneous administration of mifepristone and progesterone, 9-ER-2028, rather than the delayed progesterone administration in APR, 5-ER-770.  The second rat study outlined its limitations, noting "the potential differences and similarities in gestation between the animal and human pregnancy."  9-ER-2073.

The first case series the CPCs cite, a 2017 case series by Deborah Garratt, followed only three subjects who took progesterone after mifepristone ("2017 Garratt Case Series").  *See* 7-ER-1457; 3-ER-483–84.  The second case series, a

14

2023 case series by Joseph Turner, followed only six subjects who took
progesterone after mifepristone ("2023 Turner Case Series").  3-ER-510.
Researchers in both studies acknowledged their studies' limitations.  *See* 3-ER-516
("As a pilot trial, the study was limited to a small number of participants which did
not enable statistical assessment of whether progesterone taken after mifepristone
ingestion increased the rate of pregnancy viability."); 3-ER-485 ("There is
currently no definitive evidence for the success of using progesterone to prevent
the abortifacient effect of mifepristone.").

    The CPCs' also cited studies that did not evaluate APR.  7-ER-1458, 1503,
1505–06.  They, for example, pointed to United Kingdom guidelines
recommending the use of progesterone for pregnant individuals with early
pregnancy bleeding and a previous miscarriage.  7-ER-1505.  Those guidelines
explicitly state that they do not apply to APR:  "The recommendations [for the use
of progesterone] are not applicable in other circumstances, such as after the use of
mifepristone."  8-ER-1894; *see also* 9-ER-1924 ("[T]he committee were concerned
about this practice [of prescribing progesterone to 'reverse' mifepristone], and
were not aware of any evidence that suggested that the use of progesterone would
be safe and effective in this situation.").

    The CPCs also cited a 2016 study looking at the simultaneous use of
mifepristone with depot medroxyprogesterone acetate ("DMPA"), a progestin

contraceptive. 7-ER-1458; 3-ER-489. But DMPA is not the same as supplemental progesterone, and subjects received DMPA at the same time as mifepristone, which is not how APR works. 3-ER-489; 2-ER-233–34. And the results showed only a slight increase in the risk of ongoing pregnancy. 3-ER-494; *see also* 4-ER-727 ("[T]he study's findings suggest that concurrent administration of DMPA may slightly decrease the effectiveness of mifepristone for medication abortion" but "do not demonstrate that DMPA 'reverses' medication abortion.").

### C. Several Leading Medical Organizations Have Concluded that No Evidence Supports APR

Multiple medical organizations have noted the lack of evidence supporting APR. The American College of Obstetricians and Gynecologists ("ACOG"), which has more than 60,000 physician-members and "ranks its recommendations on the strength of evidence," stated that "[c]laims regarding abortion 'reversal' treatment are not based on science and do not meet clinical standards." 3-ER-394; 4-ER-725. The Society of Obstetricians and Gynaecologists of Canada ("SOGC") similarly stated that it "does not support prescribing progesterone to stop a medical abortion" because "claims regarding so-called abortion 'reversal' treatments are not based on scientific evidence." 4-ER-731. And the United Kingdom's Royal College of Obstetricians and Gynaecologists ("RCOG") was clear: "There are no reputable national or international clinical guidelines that recommend the use of progesterone to reverse the effect of mifepristone, and no evidence that it increases

16

the likelihood of continuing pregnancy, compared to expectant management alone." 4-ER-733.

**D. Three Federal District Courts Have Concluded that Representations about APR's Safety and Efficacy Are Misleading**

In challenges to state legislation mandating that abortion providers tell patients that mifepristone can be "reversed," three separate federal district courts evaluated evidence nearly identical to the record in this case and held that the term "reverse" was false and misleading in the context of APR. *See* 1-SER-009–3-SER-648; 3-SER-662–6-SER-1241. In *All-Options, Inc. v. Attorney General of Indiana*, the district court opined that "[t]he lack of evidence on causation goes to the question that is key for First Amendment purposes—whether the medical evidence in the record sufficiently fits the Required Disclosure as to make the statement '[s]ome evidence suggests' that mifepristone's effects 'may be avoided, ceased, or reversed' truthful and not misleading." 546 F. Supp. 3d 754, 767 (S.D. Ind. 2021). The district court held that "the medical studies in the record do not justify that statement because those studies do not support causation." *Id.*

In *Planned Parenthood of Tennessee and North Mississippi v. Slatery*, the district court held that "[t]he word 'reversal' makes the mandated message untruthful and/or misleading because it promises more than progesterone therapy has even attempted to deliver." 523 F. Supp. 3d 985, 1003 (M.D. Tenn. 2021).

17

The district court continued: "[T]he word 'reverse' suggests more—that supplemental progesterone acts as a kind of antidote to mifepristone," ultimately concluding that "the mandated 'reversal' message is misleading because it suggests progesterone therapy has reached a level of safety and efficacy that is not supported by medical evidence." *Id.*

And in *American Medical Association v. Stenehjem*, the district court held that "the statement that 'it may be possible to reverse the effects of an abortion-inducing drug' is misleading at best." 412 F. Supp. 3d 1134, 1151 (D.N.D. 2019). The district court further opined: "A law which mandates that physicians become mouthpieces for a false, misleading, and controversial 'abortion reversal' message would not survive any level of constitutional scrutiny." *Id.*

## II.   THE ATTORNEY GENERAL'S STATE ENFORCEMENT ACTION

To protect California residents from false and misleading APR advertisements, on September 21, 2023, the Attorney General filed the Enforcement Action in Alameda County Superior Court against HBI and RO. 7-ER-1592. The Attorney General brought two claims: (1) for violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*; and (2) for violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*.

The Attorney General's lawsuit is not a challenge to clinical decisions to administer APR, or to speech about APR writ large. The very small percentage of pregnant people who may reconsider their abortion decision are entitled to accurate information as they face emotional turmoil in a time-sensitive situation. With the Enforcement Action, the Attorney General seeks only to ensure those individuals are not deceived about their options. *See California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) (State has responsibility to "'prevent the deception of consumers'").

The Attorney General's suit alleges that eight statements that HBI and RO use in their APR advertisements are false and misleading: 1) that APR can "reverse" a medication abortion; 2) that APR is an "effective" process that "has been shown to increase the chances of allowing the pregnancy to continue"; 3) that APR has a 64-68% success rate; 4) that APR may be effective beyond the 72-hour window following mifepristone administration; 5) that the rate of birth defects after APR "is less or equal to the rate in the general population"; 6) that APR has resulted in "thousands of lives" saved; 7) that APR may be effective after taking mifepristone and misoprostol or after taking methotrexate; and 8) that APR can cause only non-life-threatening side effects without also stating that APR can cause severe, life-threatening bleeding. 7-ER-1617-18. The parties are currently engaged in discovery with a bench trial set for November 3, 2025. 3-SER-656–61.

19

## III.  NIFLA AND SCV

NIFLA is "a membership organization with 1,780 member pregnancy centers" with a mission to, in part, "protect life-affirming pregnancy centers by equipping them with legal resources, counsel, education, training, and support."  7-ER-1494.  NIFLA "routinely speaks about APR, advising its members and women about this progesterone-treatment option."  7-ER-1494–95.  NIFLA's members pay annual fees for NIFLA's services.  5-ER-843, 880, 912.

NIFLA member SCV is a "Christian ministry and community health clinic that specializes in providing pregnancy confirmations by a licensed physician."  7-ER-1498.  Among its services, SCV provides "patient education," "ultrasound confirmation of pregnancy," "prenatal care referrals," and "limited [sexually-transmitted disease/infection] testing and treatments."  *Id.*  SCV "referred individuals seeking treatment" to HBI's Abortion Pill Rescue Network ("APRN"), which operates a website and hotline to connect patients to medical providers who provide APR.  7-ER-1499.  Prior to the Enforcement Action, SCV planned to offer APR.  7-ER-1534.

### A.  The CPCs' APR Advertisements

The CPCs have advertised APR in the past and want to continue doing so.  7-ER-1522-29.  Those advertisements include:

1.  "It's not too late…AbortionPillReversal.com."  9-ER-2094–95.

20

2.  "Can the abortion pill be reversed?  The simple answer is yes!  If done

    in time.  For more information or to get started, call the 24/7 hotline

    today.  877-558-0333."  7-ER-2111; *see also* 7-ER-2113–17.

3.  "Can the abortion pill be reversed?  The simple answer is yes!  If done

    in time.  There is an effective process called abortion pill reversal that

    can reverse the effects of the abortion pill and allow you to continue

    your pregnancy, but time is of the essence.  For more information, reach

    out to us today."  9-ER-2115.

4.  "Science shows that Abortion Pill Reversal can be a second chance at

    choice.  A new Abortion Pill Reversal Study has been published in a

    peer-review [sic] journal.  Its findings showed that the reversal success

    rates were 64-68%.  There was also no increased risk of birth defects or

    preterm birth."  9-ER-2103.

Their advertisements have appeared on bus benches, on webpages, and in social media posts, including social media posts by CPCs that provide APR.  7-ER-2096, 2111–17; 9-ER-2094–95, 2099–2104.

NIFLA, for its part, encourages its members to provide APR, 9-ER-2107, and "published informational guides about [APR], . . . regularly consulted with centers regarding [APR], and provided sample policies that encouraged its members to speak about [APR] and to provide it as one of their services," 7-ER-1528–29.

21

NIFLA also "advis[ed] its California centers to advertise for or make statements about [APR]."  7-ER-1530.

## B.    The CPCs' Financial Earnings

The CPCs earn revenue through a variety of means.  For example, in 2022, NIFLA earned $1,251,805 in total revenue, consisting primarily of $368,151 from membership dues; $355,381 from "[a]ll other contributions"; and $528,273 from payments for providing trainings and materials.  5-ER-835, 843; *see also* 5-ER-872, 880 (2021 total revenue—$1,082,230; membership dues—$370,740; "[a]ll other contributions"—$288,178; training and materials—$422,681); 5-ER-904, 912 (2020 total revenue—$955,174; membership dues—$346,598; "[a]ll other contributions"—$289,798; trainings—$182,809).

In 2022, SCV earned $781,839 in total revenue, consisting primarily of $187,219 from fundraising, $6,301 from "clinic services," and $588,319 from "[a]ll other contributions."  6-ER-1237, 1245; *see also* 6-ER-1271, 1279 (2021 total revenue—$805,360; fundraising—$224,248; "clinic services"—$7,333; "[a]ll other contributions"—$573,779); 6-ER-1305 (2019 total revenue—$969,033; fundraising—$233,990; "clinic services"—$1,751; "[a]ll other contributions"—$733,228).

SCV's revenue is similar to that of other NIFLA members.  For example, NIFLA members Alternatives Pregnancy Center ("APC") and Pregnancy Care

Clinic ("PCC") earn similar levels of revenue from similar sources. APC's 2022 total revenue was $1,899,205 consisting primarily of $295,263 from fundraising and $1,590,416 from "[a]ll other contributions." 5-ER-939, 947; *see also* 5-ER-974, 982 (2021 total revenue—$1,629,888; fundraising—$415,877; "[a]ll other contributions"—$1,140,674); 5-ER-1010, 1018 (2019 total revenue—$758,496; fundraising—$422,166; "[a]ll other contributions"—$335,613).

PCC's 2022 total revenue was $760,510 consisting primarily of $172,435 from fundraising and $441,813 from "[a]ll other contributions." 6-ER-1048, 1056; *see also* 6-ER-1110, 1118 (2021 total revenue—$867,812; fundraising—$208,223; "[a]ll other contributions"—$594,829); 6-ER-1172, 1180 (2020 total revenue—$661,832; fundraising—$168,617; "[a]ll other contributions"—$428,994).

## IV. PROCEEDINGS BELOW

More than a year after the Attorney General filed the Enforcement Action, the CPCs filed their complaint along with a request for preliminary injunctive relief. 7-ER-1395, 1489, 1592. The CPCs alleged that the Enforcement Action chilled their speech about APR and brought three causes of action, all of which arise under 42 U.S.C. § 1983: 1) violation of the First Amendment's Free Speech Clause; 2) violation of the First Amendment's Free Exercise Clause; and 3) violation of the Fourteenth Amendment Right to Due Process for Vagueness. 7-ER-1552, 1562,

23

1566.  The CPCs pursued their preliminary injunction request only as to the first claim.  7-ER-1397.

The CPCs sought a broad preliminary injunction.  They asked the district court to bar the Attorney General "from enforcing California's UCL and FAL against NIFLA, NIFLA's members, and SCV Pregnancy Center for making the following statements, or substantively similar statements" about the "use of progesterone for abortion pill reversal":

1) "Statements using the terms 'abortion pill reversal,' 'APR,' or 'reverse' related to the use of supplemental progesterone to counteract the effects of mifepristone in a chemical abortion";

2) "Statements referring to the APR hotline or AbortionPillReversal.com";

3) "Statements indicating that supplemental progesterone for abortion pill reversal is safe"; and

4) "Statements indicating that supplemental progesterone for abortion pill reversal is effective."

7-ER-1397.

In support of their request, the CPCs offered their verified complaint, exhibits to their complaint and preliminary injunction motion, and the opening and rebuttal declarations of their expert, Dr. Susan Bane.  2-ER-188–211; 7-ER-1430–10-ER-2289.  In opposition, the Attorney General offered exhibits in support of his

24

opposition, the declaration of his expert, Dr. Creinin, and exhibits to Creinin's expert declaration.  2-ER-212–7-ER-1366.

The district court denied the CPCs' preliminary injunction request, holding that they failed to show a likelihood of success on the merits.  1-ER-003.  The district court held that the CPCs' APR advertisements qualified as commercial speech.  1-ER-008–10.  The district court also made several factual findings: 1) that "APR is not abortion reversal" and that the phrase "abortion pill reversal" is misleading; 2) that "[t]here is no credible scientific evidence that APR is safe" and therefore that "statements claiming APR is safe are (likely to be) inherently false or misleading based on [the] limited record"; and 3) that "[t]here is no credible scientific evidence that APR is effective" and therefore that "statements representing APR to be effective are also likely false or (at the very least) misleading."  1-ER-013–20.  The district court held that, because the CPCs' commercial speech was inherently misleading, it was not entitled to First Amendment protection.  1-ER-020.  The district court alternatively held that even if the advertisements were only "potentially misleading," the Attorney General's hypothetical enforcement of the UCL and FAL against the advertisements would satisfy the intermediate scrutiny standard that applies to commercial speech.  1-ER-020–22.

The district court also rejected the CPCs' argument that a hypothetical enforcement action against them would constitute viewpoint discrimination. 1-ER-022. Holding that the CPCs fell "well short of clearing [the] high bar" to establish that claim, the district court observed that "the strongest evidence that [the CPCs are] not concerned about a 'pervasive pattern' or 'plan' is the fact that [the] motion for injunctive relief was filed nearly a year after the state court proceedings were initiated." 1-ER-023.

Because it held that the CPCs failed to show a likelihood of success on the merits, the district court did not address the other three preliminary injunction factors. 1-ER-025.

## SUMMARY OF ARGUMENT

The district court correctly denied the CPCs' preliminary injunction request.

*First*, the district court correctly held that the CPCs engage in advertising of APR that qualifies as commercial speech. The district court correctly held that the CPCs' APR advertisements qualify as commercial speech under the three *Bolger* factors used in "close cases." The CPCs do not challenge the district court's determination that their APR advertisements satisfy the first *Bolger* factor. As to the second *Bolger* factor, the district court appropriately held that the CPCs advertised a specific service: APR. The record supports that determination, as the CPCs' APR advertisements consistently treat "Abortion Pill Reversal" and "APR"

26

as a specific treatment available either through HBI's APRN or through the CPCs' own clinics.

For the third *Bolger* factor, the district court properly held that the CPCs had sufficient economic motivation for their speech, as evidenced by the revenue NIFLA generates from advising its members about APR and by the CPCs' fundraising. The CPCs' APR advertisements also qualify as commercial speech absent economic motivation because their advertisements compete for a patient base.

*Second*, the district court appropriately found that the CPCs' advertisements are inherently misleading. Lack of evidence to support claims is sufficient to establish that representations are inherently misleading, consistent with the First Amendment. The district court correctly found that to be the case here, where the CPCs offered no scientific evidence showing that their APR advertisements were accurate.

*Third*, the district court correctly held that the CPCs were unlikely to succeed on their viewpoint discrimination argument. That claim, which is synonymous with a selective enforcement claim under the Fourteenth Amendment, requires a "policy" or "practice" of discriminatory enforcement decisions, which the CPCs did not show.

27

*Fourth*, the remaining preliminary injunction factors weigh in the Attorney General's favor. The CPCs' long delay in seeking the preliminary injunction undercuts its claims for interim relief. The balance of equities and public interest also tip sharply in the Attorney General's favor where the requested injunction would prevent the Attorney General from protecting California residents from false and misleading statements about a medical treatment.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking an injunction must establish that 1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm absent preliminary relief; 3) the balance of equities tips in its favor; and 4) an injunction is in the public interest. *Id.* at 20. "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement." *Cal. Chamber of Comm. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022). Only upon that showing of a colorable claim does the burden "shift[] to the government to justify the restriction on speech." *Id.*

This Court reviews the denial of a preliminary injunction for abuse of discretion. *Pimental v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Legal

questions are reviewed de novo. *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916

F.3d 749, 754 (9th Cir. 2019) (en banc).

There is a lack of clarity about whether in the First Amendment preliminary

injunction context district courts' findings of constitutional facts are subject to

abuse of discretion or *de novo* review. *Compare Smith v. Helzer*, 95 F.4th 1207,

1213-14 (9th Cir. 2024) ("[A]n abuse of discretion occurs only when the district

court 'rests its decision…on a clearly erroneous finding of fact.'") *and Am.*

*Beverage*, 916 F.3d at 754 ("'We review conclusions of law de novo and findings

of fact for clear error.") *with Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th

Cir. 2024) ("'[W]e review constitutional facts *de novo*'"). As such, the Attorney

General argues the district court's findings of constitutional facts under the *de novo*

standard.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY HELD THAT THE CPCS ARE UNLIKELY TO PREVAIL ON THE MERITS

As the moving party, the CPCs had the burden to make a "colorable claim" of

First Amendment infringement, and therefore to show that the First Amendment

protects their speech at issue. *Cal. Chambers*, 29 F.4th at 478. As the district

court correctly held, the CPCs failed to meet their burden.

A.   **The District Court Correctly Held that the CPCs' APR Advertisements Qualify as Commercial Speech**

The district court correctly held that the CPCs' APR advertisements qualified as commercial speech.[4]  "Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'"  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021).  But because "speech that does not propose a commercial transaction on its face can still be commercial speech," "[c]ourts view 'this definition [as] just a starting point'" and "try to give effect to 'a common-sense distinction between commercial speech and other varieties of speech.'"  *Id.*  The "'commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category.'"  *Id.*

"'Where the facts present a close question, "strong support" that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation.'"  *Id.* at 1115-16.  "These so-called *Bolger* factors are

---

[4] To the extent the CPCs' speech is noncommercial, their pre-enforcement standing is questionable.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (pre-enforcement standing requires showing conduct is "proscribed by statute" and that there is a "credible threat of prosecution."); *see also* 1-ER-008 (concession that UCL/FAL apply "*only* to commercial speech" "may be dispositive on the question of whether Plaintiff's speech is commercial for purposes of a future enforcement action.").

important guideposts, but they are not dispositive." *Id.*; *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 n.14 (1983) ("Nor do we mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial.").

The district court correctly applied the three *Bolger* factors and properly held that the CPCs' APR advertisements qualified as commercial speech. 1-ER-008–10. That holding is well-supported by the record. The CPCs only challenge the district court's determinations as to the second and third *Bolger* factors; they do not dispute that the speech at issue consists of advertisements.[5] Op. Br. 29–37. (CPCs' advertisements "neither reference[] a specific product nor [are] driven by an economic interest.").

### 1. The CPCs' APR Advertisements Refer to a Specific Product or Service

Noting that the CPCs "do not claim that APR as a medical treatment is not a product for the purposes of this inquiry," the district court held that the CPCs' APR advertisements satisfied the second *Bolger* factor because they refer to a specific

---

[5] Nor could they. Many of the CPCs' APR advertisements "do[] no more than propose a commercial transaction," *Bolger*, 463 U.S. at 66, because they propose only that consumers contact HBI's APRN to undergo APR. *See, e.g.*, 7-ER-1526 ("'I want to choose Abortion Pill Reversal. What should I do now?' Talk with a hotline nurse at 877-558-0333…More APR questions and answers on abortionpillreversal.com"); 9-ER-2111 ("Can the abortion pill be reversed? The simple answer is yes! If done in time. For more information or to get started, call the 24/7 hotline today. 877-558-0333.").

medical treatment. 1-ER-009. This Court has repeatedly held that medical services are specific products or services for purposes of the *Bolger* test. *See, e.g.*, *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004); *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1273 (9th Cir. 2017). The CPCs deny that their advertisements refer to a specific medical service, but the record supports the district court's determination otherwise.

*American Academy* and *First Resort* are instructive. In *American Academy*, this Court considered a California statute regulating the use of the phrase "board certified" in doctors' advertisements and held that the "advertising regulated relates to a specific product, medical services." 353 F.3d at 1106. In *First Resort*, this Court applied *American Academy* to an ordinance regulating deceptive advertising by "limited service pregnancy centers" ("LSPCs"), reaffirming that holding, and stating that the ordinance's purpose "is to regulate advertising related to a similar product: limited medical services offered by LSPCs." 860 F.3d at 1272.

So too here. The advertisements consistently refer potential patients to HBI's APRN or to the CPCs themselves for APR treatment.[6]  *See, e.g.*, 7-ER-1526 ("'I

---

[6] HBI's federal trademark registration of a service mark that includes "Abortion Pill Reversal" is further support. U.S. Reg. No. 7547269; 15 U.S.C. § 1127 (mark must be "used by a person…to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown").

want to choose Abortion Pill Reversal.  What should I do now?' Talk with a

hotline nurse at 877-558-0333 [i.e., APRN hotline]"); 7-ER-1529

("NIFLA…linked to abortionpillreversal.com"); 7-ER-1530 ("NIFLA would like

to resume…linking to abortionpillreversal.com and the APR Hotline…."); 9-ER-

2095 ("Free Pregnancy Clinics It's not too late…AbortionPillReversal.com"); 9-

ER-2096 ("If you changed your mind and have only taken the first set of pills, do

not take the second medication and call APR at (877) 558-0333 so they can help

you."); 9-ER-2113 ("For more information, give us a call or reach out to the

Abortion Pill Reversal team at 1-877-558-0333 or visit abortionpillreversal.com.");

9-ER-2117 ("If you are interested in starting the abortion pill reversal process, call

(877) 558-0333 or visit abortionpillreversal.com.").

     NIFLA's advice to its members to provide APR using HBI's training further

underscores that even where the CPCs advertise their own services, they still are

referring to the APR treatment as outlined by HBI.  9-ER-2107 (NIFLA

"recommend[s] using the training program of Abortion Pill Rescue through

Heartbeat International. https://www.abortionpillreversal.com/ 1-877-558-0333.").

Combined, this evidence underscores that the CPCs are referring to the specific

APR treatment outlined by HBI, either by referring the patients to HBI or to

themselves to provide that treatment.  *Cf. Bolger*, 463 U.S. at 66 n.13 ("[A]

company with sufficient control of the market for a product may be able to promote the product without reference to its own brand names.").

The CPCs also routinely capitalize "Abortion Pill Reversal" and "APR," further revealing that they are referring to a specific service. *See, e.g.*, 7-ER-1530 ("NIFLA would like to resume using the term 'Abortion Pill Reversal'") 9-ER-2103 ("Science shows that Abortion Pill Reversal can be a second chance at choice."); 9-ER-2107 ("NIFLA encourages provision of Abortion Pill Reversal."); 9-ER-2111 (graphic with three "Abortion Pill Reversal" statements); 9-ER-2113 ("For more information, give us a call or reach out to the Abortion Pill Reversal team…Call the APR hotline.").

The record thus belies the CPCs' claim that their advertisements "merely inform women about a general method of medical treatment that is prescribed by a doctor…and filled by a third-party pharmacy." Op. Br. 29. Accordingly, and particularly given the absence of any contrary argument by the CPCs, the district court correctly held that the CPCs' advertisements satisfy *Bolger*'s second factor.

### 2. The CPCs Have Economic Motivation for Their APR Advertisements

The district court correctly held that the CPCs have sufficient "economic motivation" to satisfy the third *Bolger* factor. 1-ER-009–10. Observing that NIFLA's services include advising its members about APR, and that NIFLA charges its members fees for its services, the district court held that those

34

circumstances provided NIFLA with "powerful economic motivation" to advertise APR. 1-ER-009. The district court also pointed to the CPCs' "fundraising" as further support for its determination. 1-ER-010.

"[E]conomic motivation is not limited simply to the expectation of a direct commercial transaction with consumers." *Ariix*, 985 F.3d at 1117. "Courts have found commercial speech even when it involves indirect benefits," such as "improvements to a brand's image" and "general exposure of a product." *Id.* "[T]he type of economic motivation is not the focus; rather the crux is on whether the speaker had an adequate economic motivation so that the economic benefit was the primary purpose for speaking." *Id.*

The record supports the district court's determination. NIFLA alleged that it provides "legal resources, counsel, education, training, and support" to its members and expressly alleged that it "advis[es] its members" about APR, "including sharing content at conferences and on its social media accounts." 7-ER-1494–95. NIFLA charges its members for those services, both by collecting annual fees and selling training materials. 5-ER-835, 843, 872, 880, 904, 912. This evidence—that NIFLA earns money by advising its members on how to offer APR, the very service being promoted in the advertisements at issue here—more than supports the district court's holding. *See Ariix, LLC*, 985 F.3d at 1117

("''[E]conomic motivation is not limited simply to the expectation of a direct commercial transaction with consumers.")

NIFLA's members, in turn, earn a significant portion of their annual revenue from fundraising, *see, e.g.*, 5-ER-939, 947; 6-ER-1048, 1056, 1237, 1245, belying the CPCs' argument that the members lack any economic motivation, Op. Br. 32. As this Court explained in *First Resort*, "the solicitation of a non-paying client base directly relates to [a CPC's] ability to fundraise and, in turn, to buy more advertisements." 860 F.3d at 1273. APC, for example, advertises its APR services. 7-ER-1525–26. SCV "previously planned to offer" APR, allegedly stopping only because of the Enforcement Action, and would "restart plans to offer" APR if the injunction was granted, and SCV regularly advertised APR. 7-ER-1534. Notably, although the CPCs dispute that their APR advertisements arise out of "economic motivation," Op. Br. 33, neither before the district court nor in this appeal do the CPCs actually dispute that their APR advertisements and services are part of their fundraising efforts. The CPCs' offer of the APR treatment, combined with the evidence that a significant portion of their revenue comes from fundraising, supports the district court's determination.

Nor does *Riley v. National Federation of the Blind of North Carolina, Inc.* require a different result. *Cf.* Op. Br. 34. There, the Court overturned a statute capping fees and mandating disclosures by professional charitable solicitation

36

groups because charitable solicitations were fully protected First Amendment speech.  487 U.S. 788, 794-95 (1988).  Here, in contrast, the CPCs do not directly solicit charitable funds through their APR advertisements—they use those advertisements, which make no mention of charitable solicitation, to build a patient base that they can tout when they ask for funds from donors.  *See, e.g.*, 7-ER-1525–26, 1534; 5-ER-947; 6-ER-1245.  *First Resort* held that this kind of economic motivation—fundraising through creation of a patient base—provided sufficient economic motivation to render advertisements to that patient base "commercial speech."[7]  860 F.3d at 1273.

In sum, the district court correctly held that the CPCs had sufficient economic motivation to satisfy the third *Bolger* factor.

### 3. The CPCs' APR Advertisements Qualify as Commercial Speech Even Absent Economic Motivation

As the district court correctly observed, 1-ER-009, satisfaction of the "economic motivation" factor was not necessary for the district court to hold that the CPCs' APR advertisements qualify as commercial speech.  Those

---

[7] There is no merit to the CPCs' argument that *First Resort* is limited to circumstances where fundraising affects employee compensation. Op. Br. 34 (relying on a line in *Ariix* where this Court provided examples of "indirect benefits" and cited *First Resort* for the premise that "benefits to employee compensation" is an example of such indirect benefits).  Read in context, *Ariix* does not "limit" *First Resort*'s holding. 985 F.3d at 1117.  And *First Resort* is clear that the fact that fundraising affected employee compensation was additional support for its holding.  860 F.3d at 1273.

37

advertisements "relate[] to the provision of certain medical services, not the exchange of ideas" and therefore qualify as commercial speech, regardless of economic motivation. *First Resort*, 860 F.3d at 1273.

"'[T]he potential commercial nature of speech does not hinge solely on whether the [speakers have] an economic motive, as even *Bolger* does not preclude classification of speech as commercial in the absence of the speaker's economic motivation.'"[8] *First Resort*, 860 F.3d at 1273; *see also Yim v. City of Seattle*, 63 F.4th 783, 800 (9th Cir. 2023) (Wardlaw, J. concurring) ("As to *Bolger*'s third factor, 'regardless of whether [the parties] have an economic motivation…their regulated speech can still be classified as commercial' under *Bolger*."). Accordingly, "regardless of whether [the CPCs] have an economic motivation in advertising, their regulated speech can still be classified as commercial." *Id.* Advertisements, like those of the CPCs here, that "'are placed in a commercial context and are directed at the providing of services rather than toward an exchange of ideas'" qualify as commercial speech. *Id.* Where the State "regulates

---

[8] The CPCs argue that the Fourth Circuit "abrogated" the en banc decision that *First Resort* cited for this point. Op. Br. 36–37. Not so. In the subsequent decision, a three-judge panel distinguished *First Resort* because the ordinance at issue in *First Resort* "directly regulated misleading advertising itself." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Baltimore*, 879 F.3d 101, 108 (4th Cir. 2018). The ordinance at issue in *Greater Baltimore* required disclosures about limited services, regardless whether the pregnancy centers advertised their services. *Id.*

advertising designed to attract a patient base in a competitive marketplace for commercially valuable services," the State "regulates 'classic examples of commercial speech.'" *Id.* at 1274.

The CPCs' APR advertisements make clear that instead of "an exchange of ideas," the advertisements compete in the marketplace for potential patients who are reconsidering their choice of medication abortion and are interested in a service that could help them maintain their pregnancy. The advertisements refer to a specific service, "Abortion Pill Reversal" or "APR." *See, e.g.*, 7-ER-1526 ("'I want to choose Abortion Pill Reversal. What should I do now?' Talk with a hotline nurse at 877-558-0333."); *see also supra* Argument I.A.1. The advertisements refer patients to a website and hotline where they can receive that service. *See, e.g.*, 9-ER-2113 ("For more information, give us a call or reach out to the Abortion Pill Reversal team…Call the APR hotline."). And the advertisements provide no information about criticisms of APR or weaknesses in the studies underlying the medical treatment, further supporting that their purpose is to promote APR. *Cf. Bernardo v. Planned Parenthood Fed'n of America*, 115 Cal. App. 4th 322, 331-32, 348 (2004) (webpage was "educational" not "commercial" where it provided information on both sides of debate).

This Court's holding in *First Resort* that economic motivation is not dispositive to the commercial speech analysis respects the importance of the

State's responsibility to guard against consumer deception.  *Contra* Op. Br. 36 (describing exercise of this traditional police power as "radical").  "Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information."  *Cent. Hudson*, 447 U.S. at 561-62.  Indeed, "[t]he First Amendment's concern for commercial speech is based on the informational function of advertising."  *Id*. at 563; *see also Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 763 (1976) ("As to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate."); *Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 399 (9th Cir. 1982) ("First amendment scrutiny of abridgements of commercial speech seeks to preserve the flow of truthful information from merchants to customers.").  That is why the State may "insur[e] that the stream of commercial information flow[s] cleanly as well as freely."  *Va. State Bd.*, 425 U.S. at 772.  *First Resort*'s holding that, even absent economic motivation, speech that "attracts a patient base in a competitive marketplace for commercially valuable services" qualifies as "commercial speech" that the State can regulate, advances the First Amendment goals of protecting listeners' access to accurate commercial information.

40

That societal interest is at the heart of the Enforcement Action.  Pregnant individuals who come across the CPCs' APR advertisements get no information about the CPCs' (purported lack of) economic motivation—all those patients see are advertisements for APR assuring them that the treatment is "safe" and "effective" at "reversing" the "abortion pill."  *See supra* Argument I.A.1.  And those individuals will soon learn that either they or their insurance companies will likely pay for that treatment.  5-ER-780; 10-ER-2189.  The Enforcement Action seeks only to ensure the advertisements those individuals see are accurate.  That the advertisements here use false and misleading language to describe a medical treatment only increases the importance of the State's ability to protect its residents from potential harm.  *Cf. Tingley v. Ferguson*, 47 F.4th 1055, 1083 (9th Cir. 2022) ("The health professions differ from other licensed professions because they *treat* other humans, and their treatment can result in physical and psychological harm to their patients.").

In sum, the district court correctly held that the CPCs' APR advertisements qualify as commercial speech.

**B.    The District Court Correctly Found that the CPCs' APR Advertisements Are Likely False and Misleading and Not Protected by the First Amendment**

As commercial speech, the CPCs' APR advertisements have no protection under the First Amendment if they are false and misleading.  *Cent. Hudson*, 447

41

U.S. at 563 ("There can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."). The district court correctly found that the CPCs' APR advertisements are inherently misleading and therefore unprotected by the First Amendment.

### 1. Consistent with the First Amendment, Lack of Scientific Evidence Can Show that Speech is False and Misleading

The CPCs suggest that commercial speech can never be deemed false or misleading unless affirmative evidence exists proving the speech false or misleading. Op. Br. 53. The CPCs contend therefore that they are entitled to relief unless the Attorney General can provide studies proving each of their claims about APR is false.[9] *Id.*

That is not the law. A lack of scientific evidence supporting a particular claim can render that claim false and misleading without offending the First Amendment. *See, e.g.*, *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1212 (D.C. Cir. 2021) ("In light of the absence of scientific support for [defendant's] proposed claims…, we conclude that the claims are inherently misleading… Our

---

[9] The sole case the CPCs cite in support, *Peel v. Atty Registration & Disciplinary Comm'n of Ill.*, Op. Br. 53–54, is inapposite. The Court considered a rule that prohibited attorneys from holding themselves out as "specialists" or as "certified," even if the attorneys had obtained certifications as specialists. 496 U.S. 91, 97 (1990). The State failed to meet the "heavy burden" of showing that prohibition of this truthful speech would protect the public from deception. *Id.* at 109. Here, the CPCs have provided insufficient evidence to support that their statements are accurate.

precedents confirm that commercial speech lacking any reliable support is properly characterized as misleading and thus may be proscribed consistent with the First Amendment."); *ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 615-16 (6th Cir. 2017) (FTC could prohibit defendant, consistent with the First Amendment, from making unqualified statements that lacked scientific support); *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 486-88, 490-91 (D.C. Cir. 2015) (rejecting First Amendment challenge and affirming FTC determination that POM's claims about the health effects of pomegranate juice were false and misleading where POM relied on weak scientific studies that did not show causation between drinking pomegranate juice and claimed health benefits); *cf. Sears*, 676 F.2d at 399 (FTC "may require prior reasonable substantiation of product performance claims after finding violations of the [FTC] Act, without offending the first amendment."). Accordingly, the CPCs' argument is baseless.

### 2. The District Court Correctly Found the CPCs' APR Advertisements Are False and Misleading

Turning to the district court's findings, after carefully reviewing the evidence, the district court appropriately found that each of the CPCs' proposed APR statements are "inherently false and misleading," and accordingly, held that the First Amendment provides no protection. 1-ER-011, 022. The record supports those determinations.

43

*"Reverse" Statements*:  The district court found that using the phrase

"'abortion pill reversal' to describe what happens in APR treatment" "is

misleading."  1-ER-014.  Noting that "[t]o reverse something is to undo it or

negate the effect of it," the district court found the CPCs' evidence showed only

that APR "provides a higher concentration of progesterone, ostensibly to better the

odds that these molecules 'outcompete' the mifepristone in binding to the

progesterone receptors." *Id.*  The district court further found that "[e]ven if

supplementing with progesterone within 72 hours of taking mifepristone and

before taking misoprostol does minimally increase the chances of continued

pregnancy…the additional progesterone does not *reverse* mifepristone." *Id.*

(emphasis in original).

The evidence before the district court more than supports its determination.

The CPCs' expert described the theory underlying APR as "overcom[ing]"

mifepristone's "effects" "by simply adding more substrate (progesterone), thus

increasing the concentration of the competing substrate (progesterone)."  7-ER-

1444.  But the CPCs' expert cited no studies about the biochemical structure of

mifepristone to support that adding progesterone has the theorized effect on

mifepristone, let alone that supplemental progesterone "reverses" mifepristone.  7-

ER-1442–44.  That failure is particularly stark given that mifepristone is effective

even though pregnancy already floods the body with large amounts of

44

progesterone.  7-ER-1442 ("Progesterone levels naturally rise during pregnancy.");
2-ER-223 ("During pregnancy, the amount of progesterone the body produces
increases substantially and these levels remain high throughout the pregnancy.");
*see also* 2-ER-222 ("Mifepristone binds to progesterone receptors preferentially
and more tightly than progesterone."); 4-ER-625 (mifepristone's "relative binding
affinity for progesterone…receptors is approximately five times greater than
progesterone.").

The CPCs provided no evidence showing that additional progesterone unseats
mifepristone from the progesterone receptors.  As such, the district court was well
within its discretion to find that the phrase "abortion pill reversal" (and impliedly
the CPCs' other proposed statements including the term "reverse" in this context)
were inherently false and misleading.  *See Slatery*, 523 F. Supp. 3d at 1002 ("[T]he
word 'reverse' does not accurately describe to patients the medical research on
progesterone therapy.").  The evidence showing that representations about APR's
"effectiveness" are misleading, as described below, further support the district
court's finding.

Accordingly, the district court properly found that the CPCs' "reverse"
statements are inherently false and misleading.

*Effectiveness Statements*:  The district court also properly found that
"statements representing APR to be effective are also likely false or (at the very

least) misleading." 1-ER-016. The district court reviewed—and outlined the flaws of—each category of evidence that the CPCs and their expert offered in support for the claim that APR is "effective." 1-ER-016–20. Addressing animal studies that the CPCs and their expert claimed show APR's effectiveness, the district court appropriately held that "while these animal studies are undoubtedly helpful in conducting research, they cannot be enough to support a finding on effectiveness in humans," 1-ER-017, which was supported by the opinion of the Attorney General's expert, 2-ER-234, and not disputed by the CPCs' expert, 7-ER-1454–55; 2-ER-192–211. Beyond identifying this overarching flaw, the district court also properly identified issues in both studies—the timing of the progesterone administration in one and the admitted gestation differences between humans and rats in the other—that undercut the CPCs' claim that the studies support their APR statements. 1-ER-017.

The district court also accurately characterized the human studies that the CPCs and their expert offered as being "riddled with problems, sample size issues, and other defects" and rejected the studies as support for the CPCs' proposed statement. 1-ER-017. The record supports that determination.

Of the six studies that the CPCs and their expert offered, four of the studies were case series: the 2012 Case Series, the 2017 Garratt Case Series, the 2023

Turner Case Series, and the 2018 Report.[10]  7-ER-1456–59; *see also* 9-ER-2050–65; 3-ER-483–87, 510–17.  Both parties' experts agreed that case series are weak evidence, 2-ER-221, 7-ER-1449, with the Attorney General's expert opining that such studies "provide no scientific proof of cause and effect," 2-ER-221, a statement that the CPCs' expert did not dispute, 2-ER-200–03.  On that basis alone, the district court correctly rejected those studies as support for the CPCs' APR effectiveness claims.

But the district court went further, outlining the flaws and limitations in each case series, each of which the record supported.  1-ER-017–20.  As the district court accurately observed, the 2012 Case Series had only six subjects, and that small number of subjects received different dosages and forms of progesterone, thereby undercutting any claims of causation between APR and pregnancy continuation.  1-ER-017; 9-ER-2062–65.  As to the 2017 Garratt Case Series, the authors were clear: "There is currently no definitive evidence for the success of using progesterone to prevent the abortifacient effect of mifepristone."  3-ER-484–85; *see also* 1-ER-018.  The 2023 Turner Case Series followed only six subjects and again was unequivocal:  "Results of this pilot study support the need for further larger scale trials in this field."  3-ER-510; *see also* 1-ER-018.

---

[10] That physicians might use such evidence for clinical decision-making does not mean that such evidence supports the CPCs' unequivocal APR advertisements. *Contra* Op. Br. 54.

As to the 2018 Report, the district court accurately identified its "glaring issues." 1-ER-018; *see also All-Options, Inc.*, 546 F. Supp. 3d at 769 (APR "medical studies, testimony about biological principles, and physicians' clinical experiences…do[] not establish causation"). As the district court described, the 2018 Report did not report outcomes for the subjects whose pregnancies did not continue or for the 207 subjects who fell outside the study's parameters. 1-ER-018; 9-ER-2053–54. The subjects in the 2018 Report received a variety of progesterone dosages (most of which the 2018 Report does not detail) through a variety of means (e.g., oral capsules, intramuscular injections, vaginal suppositories, oral capsules administered vaginally) from 325 different medical providers. 1-ER-018; 9-ER-2055–56. The 2018 Report also failed to correlate the gestational age of the pregnancy with the different forms of progesterone treatment, which matters because the effectiveness of mifepristone wanes the longer pregnancy continues. 1-ER-018; 9-ER-2056. And the district court properly highlighted that the 2018 Report appeared in a "journal that deals in 'technical and information assistance' for 'attorneys, healthcare professionals, educators, and administrators on legal, medical, and ethical issues rising from healthcare decisions'"—raising concerns about the strength of the peer-review process the 2018 Report underwent. 1-ER-017 (quoting 2-ER-230–31); *see also* 3-ER-398.

The other two studies the CPCs and their expert cited were randomized controlled trials: the 2019 UC Davis Study and the 2016 DMPA Study. 7-ER-1458–59. The district court appropriately rejected these studies as evidence of APR's effectiveness. 1-ER-019–20. For the 2016 DMPA Study, the district court accurately considered that the study's "'primary focus'" was not the study of APR. 1-ER-019. Indeed, the drug used in the 2016 DMPA Study was DMPA, not supplemental progesterone. 3-ER-490. The district court also properly considered that the study showed that DMPA (i.e., not supplemental progesterone) only "'might slightly decrease medication abortion effectiveness.'" 1-ER-019.

In rejecting the UC Davis 2019 Study as supporting evidence for the CPCs' APR effectiveness statements, the district court appropriately considered that the study enrolled only twelve individuals before having to stop prematurely from safety concerns. 1-ER-019–20; 2-ER-237. As the district court properly concluded, and as the evidence before the district court supported, results from twelve subjects cannot establish the effectiveness of APR. 1-ER-019; 2-ER-237–38.

Accordingly, the district court properly found that the CPCs' "effectiveness" statements are inherently false and misleading.

*Safety Statements*: The district court also properly found "that statements claiming that APR is safe are (likely to be) inherently false or misleading based on

49

this limited record." 1-ER-014. As the district court accurately highlighted, the CPCs presented no studies establishing that APR was safe. 1-ER-015–16; *see also Slatery*, 523 F. Supp. 3d at 1003 ("the mandated 'reversal' message is misleading because it suggests progesterone therapy has reached a level of safety and efficacy that is not supported by medical evidence"). The 2018 Report provided no information about maternal outcomes. 3-ER-497–507. And the three small case series following subjects who underwent APR treatment are insufficient scientific evidence to establish that APR is safe. *See* 3-ER-483–87, 510–17; 9-ER-2062–65; *see also* 2-ER-221 ("Case reports and case series provide no scientific proof of cause and effect"); 7-ER-1449 (case series and reports "are considered lower levels of evidence").

Instead, as the district court rightly observed, the CPCs and their expert relied on studies about progesterone in contexts other than APR, and that reliance was insufficient to establish that *APR* is safe. 1-ER-016; 7-ER-1445–46, 1502–03. APR is more than just the administration of progesterone: an individual must 1) take mifepristone; 2) take supplemental progesterone for a period of at least two weeks; and 3) not take misoprostol. 7-ER-1510–11; 5-ER-770, 781; 9-ER-2107. Only the 2019 UC Davis Study attempted to evaluate the health and safety outcomes of APR for its subjects, with the study ending prematurely because of

hemorrhaging by three of the twelve subjects—suggesting that APR has safety risks.  2-ER-237; 7-ER-1361–62.

Further supporting the district court's determination was its citation to statements from ACOG, SOGC, and RCOG, all of which highlighted potential safety risks from APR.  1-ER-015; *see also* 4-ER-731, 734; 7-ER-1460.

Pointing to the district court's ACOG reference, the CPCs claim that the district court "took sides in a debate between professional organizations."  Op. Br. 49.  First, the CPCs' claim that there is a "debate" underscores the false and misleading nature of their proposed representations—the existence of this purported debate is absent from any of the CPCs' APR advertisements.  *See, e.g.* 9-ER-2095–96, 2100–05, 2111–17.  Even if patients learn about the weakness in the evidence supporting APR before actually undergoing the treatment, the CPCs' advertisements have already harmed them.  *Cf. Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ("The Federal Trade Act is violated if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract."); *Veera v. Banana Republic, LLC*, 6 Cal. App. 5th 907, 918 (2016) (UCL/FAL "are designed" "to protect consumers … by … prohibiting businesses from using false and deceptive advertising to lure consumers to shop").

51

Second, as reflected by the district court's findings, the evidence purportedly supporting APR treatment is so weak that no true debate exists. 1-ER-014–20; *see also Stenehjem*, 412 F. Supp. 3d at 1151 (reviewing nearly identical evidence, district court held "the record reveals no real, serious debate within the medical profession at the current time."). The anti-abortion American Association of Pro-Life Obstetricians and Gynecologists, which supports the use of APR, relies on the same evidence outlined above, which does not show that APR "reverses" mifepristone or that APR is "safe" or "effective." 5-ER-821–828.

Third, the CPCs' expert approvingly cited ACOG's clinical guidance regarding the use of progesterone therapy in a context other than APR, thus tacitly acknowledging ACOG as an authority. 7-ER-1446.

In sum, the record supports each of the district court's findings. The district court correctly found that each of the CPCs' APR advertisements is inherently misleading.

### 3. The CPCs' Scientific Debate and Opinion Arguments Are Meritless

The CPCs' reliance on *ONY, Inc. v. Cornerstone Therapeutics, Inc.* is misplaced.[11] Op. Br. 38–42. First, the CPCs waived this argument by failing to

---

[11] The CPCs' reliance on *California Chamber* is equally misplaced. Op. Br. 38, 50. That case concerned compelled speech, which involves a different framework that looks at whether the speech is "uncontroversial." 29 F.4th at 477.

raise it with the district court. *See generally* 7-ER-1401–27; 2-ER-172–86.

"Absent exceptional circumstances, [this Court] generally will not consider

arguments raised for the first time on appeal," despite having "discretion to do so."

*Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011). This Court will

exercise that discretion only in the following limited circumstances: (1) "to prevent

a miscarriage of justice"; (2) "when a change in law raises a new issue while an

appeal is pending"; and (3) "when the issue is purely one of law." *Id.* The CPCs

do not even assert that any of these exceptions apply.

    Second, even if this Court were to consider the CPCs' argument, it has no

merit because *ONY* has no application to the facts in this case. In *ONY*, the Second

Circuit addressed a medical manufacturer's claims of false advertising by another

medical manufacturer in a study published in a peer-reviewed journal. 720 F.3d

490, 494 (2d Cir. 2013). Noting that the statements were "made as part of an

ongoing scientific discourse about which there is considerable disagreement," the

Second Circuit concluded that "to the extent a speaker or author draws conclusions

from non-fraudulent data, based on accurate descriptions of the data and

methodology underlying those conclusions, on subjects about which there is

legitimate ongoing scientific disagreement, those statements are not grounds for a

claim of false advertising under the Lanham Act." *Id.* at 497-98.

In contrast, here, the CPCs target *consumers* with their false and misleading advertisements. 7-ER-1492; 9-ER-2094–96, 2111–17. The "First Amendment ensures a robust discourse in the pages of academic journals, but it does not immunize false or misleading commercial claims." *Eastman Chemical Co. v. Plastipure, Inc.*, 775 F.3d 230, 236 (5th Cir. 2014); *see also Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 534 (1st Cir. 2023) (*ONY* did not apply to "explanatory document" with target audience of "laypeople seeking to determine whether a certain procedure is covered by their medical insurance").

The CPCs ask this Court to allow them to deploy their APR advertisements to consumers through webpages, social media posts, and physical advertisements, 9-ER-2094–96, 2111–17—a far cry from the "peer-reviewed journals" and "scientific public sit[ting] as jury" that *ONY* contemplated. 720 F.3d at 497. The CPCs' proposed APR advertisements do not even mention that a purported scientific debate exists. *See, e.g.*, 9-ER-2094–96, 2111–17. That absence is glaring given that their target audience consists of individuals who are unlikely to know about this so-called debate and have limited time to research the veracity of the CPCs' advertisements. *See Eastman*, 775 F.3d at 236 (claims arose from "'statements made without the necessary context presented by a full scientific study, such as a description of the data, the experimental methodology, the

54

potential conflicts of interest, and the differences between raw data and the

conclusions drawn by the researcher'").

The CPCs' reliance on *Bernardo v. Planned Parenthood Federation of*

*America* is equally misplaced. Op. Br. 41. In *Bernardo*, the California Court of

Appeal held that Planned Parenthood's webpages explaining its position on the

theory about a link between abortion and breast cancer were "statements of

opinion." 115 Cal. App. 4th at 331, 348. Unlike the advertisements at issue here,

in the headline to its webpage, Planned Parenthood was explicit that the statements

were its "position" on the issue of whether abortion posed risks of breast cancer.

*Id.* at 348. The webpage included studies supporting Planned Parenthood's

position as well as studies supporting the existence of a link between abortion and

breast cancer and advised readers to "visit a qualified health care provider for

personal medical evaluation, counseling, and services." *Id.* at 344-45.

The difference between *Bernardo* and this case is stark. The CPCs' APR

advertisements include unequivocal statements about APR's efficacy such as "Can

the abortion pill be reversed? The simple answer is yes!," 9-ER-2111; "There is an

effective process called abortion pill reversal that can reverse the effects of the

abortion pill and allow you to continue your pregnancy," 9-ER-2115; and "Science

shows that Abortion Pill Reversal can be a second chance at choice," 9-ER-2103.

These advertisements fail to inform potential patients about the significant

weaknesses in the science underlying APR. And the advertisements direct potential patients to contact HBI's APRN, not just any qualified medical provider. 9-ER-2094–2104, 2111–17. As the district court correctly held, these advertisements aim to persuade potential patients to undergo APR, not express an opinion about a debate. 1-ER-009-10.

Accordingly, neither *ONY* nor *Bernardo* support the CPCs.

### 4. The District Court Correctly Held in the Alternative that the Attorney General Has Satisfied Intermediate Scrutiny

The district court correctly held in the alternative that even if the CPCs' APR advertisements were only potentially misleading, the Enforcement Action satisfies *Central Hudson*'s intermediate scrutiny standard.[12] 1-ER-020–21. The government may regulate "potentially misleading" commercial speech, so long as the government asserts a "'substantial'" interest, the "'regulation directly advances the governmental interest asserted,'" and the regulation "'is not more extensive than is necessary to serve that interest.'" *Am. Acad.*, 353 F.3d at 1106-07. The record before the district court supports its determination.

Significantly, the CPCs offer no opposition to the district court's holding that the Attorney General had a "substantial interest" in regulating potentially

---

[12] "'Because the district court considered this issue, it is not waived on appeal.'" *Cadena v. Customer Connexx LLC*, 107 F.4th 902, 908 n.4 (9th Cir. 2024).

misleading claims about a medical treatment.  Op. Br. 56–57.  Nor could they.

"There is no question that California has a substantial interest in protecting

consumers from misleading advertising by medical professionals."  *Am. Acad.*, 353

F.3d at 1108; *see also Pearson v. Shalala*, 164 F.3d 650, 656 (D.C. Cir. 1990)

("[T]he government's interest in preventing consumer fraud/confusion may well

take on added importance in the context of a product…that can affect the public's

health.").

     Nor can the CPCs succeed by arguing that the district court erred when

determining that the Enforcement Action "directly advance[d]" the Attorney

General's interest and was "narrowly tailored to achieve the ultimate goal."  1-ER-

021.  The "fit" between the State's interest and its regulation "need not be perfect

nor the single best to achieve those ends" nor must it be "the least restrictive means

available."  *Am. Acad.*, 353 F.3d at 1111.  All that is required is that the chosen

means be "one whose scope is narrowly tailored to achieve the legislative

objective."  *Id.*

     Through the Enforcement Action, the Attorney General deployed California's

consumer protection laws to address eight specific statements made in

advertisements for APR that the Attorney General has determined are false and

misleading based on a lack of scientific evidence supporting the claims.  7-ER-

1617–18.  As outlined above, the Attorney General has marshalled significant

evidence supporting his claims that the statements are false and misleading. *See supra* Argument I.B.2. And the Enforcement Action is narrowly tailored, prosecuting only those eight statements without attempting to bar APR as a treatment or to prohibit all commercial speech about APR. 7-ER-1617–18.

*Kuba v. 1-A Agricultural Association* and *Cornelio v. Connecticut*, which the CPCs cite, are inapposite. Op. Br. 57. *Kuba* struck down a state policy that limited expressive activity because there was no evidence that it would address the harms identified by the State, i.e. "congestion and danger to safety." 387 F.3d 850, 859 (9th Cir. 2004). By contrast, here, the record supports that the Enforcement Action *will* address the harms identified by the Attorney General, specifically that the eight APR statements are likely to mislead potential patients.

In *Cornelio*, the Second Circuit overturned the district court's dismissal of a complaint that plausibly alleged that mandatory disclosure of online identifiers by registered sexual offenders violated the First Amendment. 32 F.4th 160, 177 (2d Cir. 2022). In so holding, the Second Circuit opined that the district court claimed to apply intermediate scrutiny, "but its analysis more closely resembled rational basis review." *Id.* Here, the district court had an ample record that, again, justified its holding that the Enforcement Action satisfies intermediate scrutiny.

Accordingly, the district court appropriately held that the Attorney General alternatively satisfied intermediate scrutiny.

58

## C. The District Court Correctly Held that the CPCs Have Not Shown that the Attorney General Engaged in Viewpoint Discrimination

The district court correctly held that the CPCs were unlikely to succeed on their argument that a hypothetical enforcement action against them would constitute viewpoint discrimination in violation of the First Amendment.[13]  1-ER-022–25.  The record supports that determination.

"[A] policy that is 'viewpoint neutral on its face may still be unconstitutional if not applied uniformly.'"  *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022).  "[A] plaintiff must show that [the government's] content-discriminatory enforcement of [a statute] is the result of an intentional policy or practice."  *Hoye*, 653 F.3d at 855.  "Plaintiffs are generally required to show the existence of an unconstitutional policy by extrapolating from a series of enforcement actions…in many cases a formidable task."  *Id.*; *cf. Yelp, Inc. v. Paxton*, --- F.4th ---, 2025 WL 1404272, at *7 (9th Cir. 2025) ("[S]tate enforcement arms will not be able to pursue every false or misleading statement or

---

[13] The CPCs' viewpoint discrimination is "one in the same" with a selective enforcement claim.  1-ER-022; *see also Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011) ("We have made clear that such a claim [i.e., viewpoint discriminatory enforcement] is available, but have usually not categorized it as an 'as-applied' First Amendment challenge.  Instead, we have generally classified such challenges as selective enforcement equal protection claims.").

Quoting *Hoye*, the district court appropriately observed that the CPCs' standing for a viewpoint discrimination claim is questionable.  1-ER-024.

59

other law violation, and it would read too much into their enforcement decisions invariably to presume bias, selective retaliation, or unconstitutional harassment."). The CPCs failed to accomplish this "formidable task."

As the district court held, the Attorney General has filed a single enforcement action alleging that eight specific APR statements are false and misleading. 1-ER-024. A single enforcement action is insufficient to show the requisite "policy or practice." *Hoye*, 653 F.3d at 855 (plaintiffs are generally required to point to "a series of enforcement actions").[14]

The district court also appropriately rejected the CPCs' argument that Planned Parenthood was sufficiently similarly situated that the Attorney General's failure to enforce California's consumer protection laws against Planned Parenthood evidenced viewpoint discrimination. *Id.* The CPCs claimed that Planned Parenthood's representations about medication abortion are "false and misleading," akin to the allegations the Attorney General raised in the Enforcement Action. *Id.*; *see also* 7-ER-1543–52. As the district court held, and as the record supports, Planned Parenthood's representations are not similarly situated. 1-ER-024–25. Indeed, Planned Parenthood's statements about medication abortion are supported

---

[14] The CPC's claims of discrimination are further belied by the three federal district court holdings that similar statements, supported by virtually identical evidence, were false and misleading. *See supra* Statement of Case I.D.

by FDA and its approval of medication abortion, as well as decades of research on the safety of medication abortion. 2-ER-215–20; 4-ER-546–85, 675–93.

The district court also properly held that the press releases and press conferences that the CPCs offered were not evidence that the Attorney General engaged in selective enforcement of the UCL and FAL. 1-ER-024. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). "A government entity has the right to 'speak for itself'…'is entitled to say what it wishes,'…and to select the views that it wants to express." *Id.*; *cf. Yelp*, ---F.4th---, 2025 WL 1404272, at *9 (courts should not "treat[] the commonplace stridency of prosecutorial press releases as synonymous with *Younger* bad faith"). As the district court accurately observed when reaching its decision, the question is the *application* of the Attorney General's power, and the CPCs have pointed to a single enforcement action. 1-ER-024; 7-ER-1520–21.

Each of the cases the CPCs cite are inapposite because they address statutes or regulations that discriminate between types of speech, rather than the selective enforcement theory that the CPCs pursued. Op. Br. 25–26; *see Reed v. Town of Gilbert*, 576 U.S. 155, 159 (2015) (ordinance placing greater restrictions on signs "directing the public to a meeting of a nonprofit group"); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557, 579 (2011) (statute prohibiting "sale, disclosure, and use

61

of pharmacy records"); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 822-23 (1995) (policy denying funding for student groups engaged in religious activity); *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 644-45 (1994) (statute requiring cable companies to broadcast local television stations); *United States v. Caronia*, 703 F.3d 149, 165 (2d Cir. 2012) (federal government's interpretation of statute to "prohibit off-label promotion" of drug).

The district court correctly held that the CPCs were unlikely to succeed on their viewpoint discrimination argument.

## II.  THE CPCS HAVE NOT SUFFERED IRREPARABLE HARM SUFFICIENT TO JUSTIFY INTERIM RELIEF

Because the CPCs fail to show a colorable claim for relief, this Court need not address the remaining preliminary injunction factors. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011) (because plaintiff "failed to satisfy its burden of demonstrating that it has met the first element, we need not consider the remaining three."). But even if the CPCs had satisfied that burden, they have not satisfied the remaining preliminary injunction requirements. *See id.* at 776 ("While a First Amendment claim 'certainly raises the specter' of irreparable harm and public interest considerations, proving the likelihood of such a claim is not enough to satisfy *Winter*.").

The CPCs' long delay in bringing their preliminary injunction request undercuts their argument for interim injunctive relief. "'A preliminary injunction

is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights,'" but "'[b]y sleeping on its rights a plaintiff demonstrates the lack of need for speedy action.'" *Lydo Enter., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (delay of "months" "undercut" plaintiff's "claim of irreparable harm").

The record reflects that the CPCs had knowledge of the Enforcement Action shortly after its filing.  7-ER-1527; 9-ER-2101, 2105.  And yet, the CPCs waited over a year to file their lawsuit and seek a preliminary injunction.  7-ER-1395–99, 1489, 1592.  In that time, the Attorney General has taken no enforcement action against them.  The CPCs' delay undermines their argument that interim injunctive relief is necessary, and they have yet to justify or explain that delay.  Accordingly, this factor supports denying the CPCs' preliminary injunction request.

## III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FACTORS SUPPORT THE DISTRICT COURT'S DENIAL OF THE PRELIMINARY INJUNCTION

"'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'"  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers).  The balance of equities and the public interest tip sharply in favor of the Attorney General.  The CPCs, if successful, would prohibit the Attorney General from using California's consumer protection laws against false and misleading statements in

advertisements for a medical procedure. *Cf. Pearson*, 164 F.3d at 656 ("[T]he government's interest in preventing consumer fraud/confusion may well take on added importance in the context of a product…that can affect the public's health."). Accordingly, these factors also support denial of the CPCs' preliminary injunction request.

## CONCLUSION

This Court should affirm the district court's denial of the CPCs' preliminary injunction motion.

Dated:  June 4, 2025                    Respectfully submitted,

                                        *s/ Erica Connolly*

                                        ROB BONTA
                                          *Attorney General of California*
                                        NELI N. PALMA
                                          *Senior Assistant Attorney General*
                                        KATHLEEN BOERGERS
                                        KARLI EISENBERG
                                          *Supervising Deputy Attorneys General*
                                        ERICA CONNOLLY
                                        LAUREN ZWEIER
                                        HAYLEY PENAN
                                          *Deputy Attorneys General*

64

## STATEMENT OF RELATED CASES

The State is not aware of any related cases, as defined by Ninth Circuit Rule 28-2.6, that are currently pending in this Court and are not already consolidated here.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-2287

I am the attorney or self-represented party.

**This brief contains** | 13,879 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Erica Connolly | **Date** | June 4, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

# CERTIFICATE OF SERVICE

Case Name:  **NIFLA, et al. v. Bonta**          No.  **2:24-cv-08468**

I hereby certify that on June 4, 2025, I electronically filed the following documents with the Clerk of the Court by using the ACMS system:

**APPELLEE'S ANSWERING BRIEF**

I certify that **all** participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on June 4, 2025, at Los Angeles, California.

|                        |                        |
|:----------------------:|:----------------------:|
| Cheryll Tran           | /s/ Cheryll Tran       |
| Declarant              | Signature              |

SA2024304499
67688145.docx